BIBB, DIRECTOR, DEPARTMENT OF PUBLIC
SAFETY OF ILLINOIS, ET AL. *v.* NAVAJO
FREIGHT LINES, INC., ET AL.

No. 94. Argued March 30–31, 1959.—Decided May 25, 1959.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for appellants. With him on the brief were *Latham Castle,* Attorney General of Illinois,

and *Raymond S. Sarnow* and *A. Zola Groves,* Assistant Attorneys General.

*David Axelrod* argued the cause for appellees. With him on the brief were *Jack Goodman* and *Carl L. Steiner.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

We are asked in this case to hold that an Illinois statute [1] requiring the use of a certain type of rear fender

---

[1] The state statute (effective July 8, 1957) in relevant part provides:

"It is unlawful for any person to operate any motor vehicle of the second division upon the highways of this state outside the corporate limits of a city, village or incorporated town unless such vehicle is equipped with rear fender splash guards which shall comply with the specifications hereinafter provided in this Section; except that any motor vehicle of the second division which is or has been purchased, new or used, prior to August 1, 1957 shall be equipped with rear fender splash guards which are so attached as to prevent the splashing of mud or water upon the windshield of other motor vehicles and such splash guards on such vehicle shall not be required to comply with the specifications hereinafter provided in this Section until January 1, 1958.

"The rear fender splash guards shall contour the wheel in such a manner that the relationship of the inside surface of any such splash guard to the tread surface of the tire or wheel shall be relatively parallel, both laterally and across the wheel, at least throughout the top 90 degrees of the rear 180 degrees of the wheel surface; provided however, on vehicles which have a clearance of less than 5 inches between the top of the tire or wheel and that part of the body of the vehicle directly above the tire or wheel when the vehicle is loaded to maximum legal capacity, the curved portion of the splash guard need only extend from a point directly behind the center of the rear axle and to the rear of the wheel surface upwards to within at least 2 inches of the bottom line of the body when the vehicle is loaded to maximum legal capacity. On all vehicles to which this Section applies, there shall be a downward extension of the curved surface which shall end not more than 10 inches from the ground

mudguard on trucks and trailers operated on the highways of that State conflicts with the Commerce Clause of the Constitution. The statutory specification for this type of mudguard provides that the guard shall contour the rear wheel, with the inside surface being relatively parallel to the top 90 degrees of the rear 180 degrees of the whole surface.[2] The surface of the guard must extend downward to within 10 inches from the ground when the truck is loaded to its maximum legal capacity. The guards must be wide enough to cover the width of the protected tire, must be installed not more than 6 inches from the tire surface when the vehicle is loaded

when the vehicle is loaded to maximum legal capacity. This downward extension shall be part of the curved surface or attached directly to said curved surface, but it need not contour the wheel.

"The splash guards shall be wide enough to cover the full tread or treads of the tires being protected and shall be installed not more than 6 inches from the tread surface of the tire or wheel when the vehicle is loaded to maximum legal capacity. The splash guard shall have a lip or flange on its outside edge to minimize side throw and splash. The lip or flange shall extend toward the center of the wheel, and shall be perpendicular to and extend not less than 2 inches below the inside or bottom surface line or plane of the guard.

"The splash guards may be constructed of a rigid or flexible material, but shall be attached in such a manner that, regardless of movement, either by the splash guards or the vehicle, the splash guards will retain their general parallel relationship to the tread surface of the tire or wheel under all ordinary operating conditions." Ill. Rev. Stat., 1957, c. 95½, § 218b.

Motor vehicles of the second division are defined as "Those vehicles which are designed and used for pulling or carrying freight and also those vehicles or motor cars which are designed and used for the carrying of more than seven persons." Ill. Rev. Stat., 1957, c. 95½, § 99 (b).

[2] The specifications are somewhat modified if the clearance between the top of the tire and the body of the vehicle directly above it is less than 5 inches when the vehicle is loaded to its maximum legal capacity.

to maximum capacity, and must have a lip or flange on its outer edge of not less than 2 inches.[3]

Appellees, interstate motor carriers holding certificates from the Interstate Commerce Commission, challenged the constitutionality of the Illinois Act. A specially constituted three-judge District Court concluded that it unduly and unreasonably burdened and obstructed interstate commerce, because it made the conventional or straight mudflap, which is legal in at least 45 States, illegal in Illinois, and because the statute, taken together with a Rule of the Arkansas Commerce Commission[4] requiring straight mudflaps, rendered the use of the same motor vehicle equipment in both States impossible. The statute was declared to be violative of the Commerce Clause and appellants were enjoined from enforcing it. 159 F. Supp. 385. An appeal was taken and we noted probable jurisdiction. 358 U. S. 808.

The power of the State to regulate the use of its highways is broad and pervasive. We have recognized the peculiarly local nature of this subject of safety, and have upheld state statutes applicable alike to interstate and intrastate commerce, despite the fact that they may have an impact on interstate commerce. *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Maurer* v. *Hamilton,* 309 U. S. 598; *Sproles* v. *Binford,* 286 U. S. 374. The regulation of highways "is akin to quarantine

---

[3] There are certain exemptions from the statute, but their validity or the validity of the statute in light of them is not questioned here. But see *Rudolph Express Co.* v. *Bibb,* 15 Ill. 2d 76, 153 N. E. 2d 820. No contention is here made that the statute discriminates against interstate commerce, and it is clear that its provisions apply alike to vehicles in intrastate as well as in interstate commerce. Nor is it contended that the statute violates the Due Process Clause of the Fourteenth Amendment. Cf. *People* v. *Warren,* 11 Ill. 2d 420, 143 N. E. 2d 28.

[4] Arkansas Commerce Commission Rule 100, December 13, 1957

measures, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the state has exceptional scope for the exercise of its regulatory power, and which, Congress not acting, have been sustained even though they materially interfere with interstate commerce." *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 783.

These safety measures carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field.[5] Unless we can conclude on the whole record that "the total effect of the law as a safety measure in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it" (*Southern Pacific Co.* v. *Arizona, supra,* pp. 775–776) we must uphold the statute.

The District Court found that "since it is impossible for a carrier operating in interstate commerce to determine which of its equipment will be used in a particular area, or on a particular day, or days, carriers operating into or through Illinois . . . will be required to equip all their trailers in accordance with the requirements of the Illinois Splash Guard statute." With two possible exceptions

---

[5] It is not argued that there has been a pre-emption of the field by federal regulation. While the Interstate Commerce Commission has, pursuant to § 204 (a) of the Interstate Commerce Act (49 Stat. 546, 49 U. S. C. § 304 (a)), promulgated its Motor Carrier Safety Regulations to govern vehicles operating in interstate or foreign commerce (see 49 CFR, Pts. 190–197), it has expressly declined to establish any requirements concerning wheel flaps, and has disclaimed any intention to occupy the field or abrogate state regulations not inconsistent with its standards. 54 M. C. C. 337, 354, 358.

the mudflaps required in those States which have mudguard regulations would not meet the standards required by the Illinois statute. The cost of installing the contour mudguards is $30 or more per vehicle. The District Court found that the initial cost of installing those mudguards on all the trucks owned by the appellees ranged from $4,500 to $45,840. There was also evidence in the record to indicate that the cost of maintenance and replacement of these guards is substantial.

Illinois introduced evidence seeking to establish that contour mudguards had a decided safety factor in that they prevented the throwing of debris into the faces of drivers of passing cars and into the windshields of a following vehicle. But the District Court in its opinion stated that it was "conclusively shown that the contour mud flap possesses no advantages over the conventional or straight mud flap previously required in Illinois and presently required in most of the states" (159 F. Supp., at 388) and that "there is rather convincing testimony that use of the contour flap creates hazards previously unknown to those using the highways." *Id.*, at 390. These hazards were found to be occasioned by the fact that this new type of mudguard tended to cause an accumulation of heat in the brake drum, thus decreasing the effectiveness of brakes, and by the fact that they were susceptible of being hit and bumped when the trucks were backed up and of falling off on the highway.

These findings on cost and on safety are not the end of our problem. Local regulation of the weight of trucks using the highways upheld in *Sproles* v. *Binford, supra,* also involved increased financial burdens for interstate carriers. State control of the width and weight of motor trucks and trailers sustained in *South Carolina Highway Dept.* v. *Barnwell Bros., supra,* involved nice questions of judgment concerning the need of those regulations so far as the issue of safety was concerned. That case also pre-

sented the problem whether interstate motor carriers, who were required to replace all equipment or keep out of the State, suffered an unconstitutional restraint on interstate commerce. The matter of safety was said to be one essentially for the legislative judgment; and the burden of redesigning or replacing equipment was said to be a proper price to exact from interstate and intrastate motor carriers alike. And the same conclusion was reached in *Maurer* v. *Hamilton, supra,* where a state law prohibited any motor carrier from carrying any other vehicle above the cab of the carrier vehicle or over the head of the operator of that vehicle. Cost taken into consideration with other factors might be relevant in some cases to the issue of burden on commerce. But it has assumed no such proportions here. If we had here only a question whether the cost of adjusting an interstate operation to these new local safety regulations prescribed by Illinois unduly burdened interstate commerce, we would have to sustain the law under the authority of the *Sproles, Barnwell,* and *Maurer* cases. The same result would obtain if we had to resolve the much discussed issues of safety presented in this case.

This case presents a different issue. The equipment in the *Sproles, Barnwell,* and *Maurer* cases could pass muster in any State, so far as the records in those cases reveal. We were not faced there with the question whether one State could prescribe standards for interstate carriers that would conflict with the standards of another State, making it necessary, say, for an interstate carrier to shift its cargo to differently designed vehicles once another state line was reached. We had a related problem in *Southern Pacific Co.* v. *Arizona, supra,* where the Court invalidated a statute of Arizona prescribing a maximum length of 70 cars for freight trains moving through that State. More closely in point is *Morgan* v. *Virginia,* 328 U. S. 373, where a local law required a reseating of passengers on interstate

busses entering Virginia in order to comply with a local segregation law. Diverse seating arrangements for people of different races imposed by several States interfered, we concluded, with "the need for national uniformity in the regulations for interstate travel." *Id.*, at 386. Those cases indicate the dimensions of our present problem.

An order of the Arkansas Commerce Commission, already mentioned,[6] requires that trailers operating in that State be equipped with straight or conventional mudflaps. Vehicles equipped to meet the standards of the Illinois statute would not comply with Arkansas standards, and vice versa. Thus if a trailer is to be operated in both States, mudguards would have to be interchanged, causing a significant delay in an operation where prompt movement may be of the essence. It was found that from two to four hours of labor are required to install or remove a contour mudguard. Moreover, the contour guard is attached to the trailer by welding and if the trailer is conveying a cargo of explosives (e. g., for the United States Government) it would be exceedingly dangerous to attempt to weld on a contour mudguard without unloading the trailer.

It was also found that the Illinois statute seriously interferes with the "interline" operations of motor carriers—that is to say, with the interchanging of trailers between an originating carrier and another carrier when the latter serves an area not served by the former. These "interline" operations provide a speedy through-service for the shipper. Interlining contemplates the physical transfer of the entire trailer; there is no unloading and reloading of the cargo. The interlining process is particularly vital in connection with shipment of perishables, which would spoil if unloaded before reaching their destination, or with the movement of explosives carried

---

[6] Note 4, *supra*.

under seal. Of course, if the originating carrier never operated in Illinois, it would not be expected to equip its trailers with contour mudguards. Yet if an interchanged trailer of that carrier were hauled to or through Illinois, the statute would require that it contain contour guards. Since carriers which operate in and through Illinois cannot compel the originating carriers to equip their trailers with contour guards, they may be forced to cease interlining with those who do not meet the Illinois requirements. Over 60 percent of the business of 5 of the 6 plaintiffs is interline traffic. For the other it constitutes 30 percent. All of the plaintiffs operate extensively in interstate commerce, and the annual mileage in Illinois of none of them exceeds 7 percent of total mileage.

This in summary is the rather massive showing of burden on interstate commerce which appellees made at the hearing.

Appellants did not attempt to rebut the appellees' showing that the statute in question severely burdens interstate commerce. Appellants' showing was aimed at establishing that contour mudguards prevented the throwing of debris into the faces of drivers of passing cars and into the windshields of a following vehicle. They concluded that, because the Illinois statute is a reasonable exercise of the police power, a federal court is precluded from weighing the relative merits of the contour mudguard against any other kind of mudguard and must sustain the validity of the statute notwithstanding the extent of the burden it imposes on interstate commerce. They rely in the main on *South Carolina Highway Dept.* v. *Barnwell Bros., supra*. There is language in that opinion which, read in isolation from such later decisions as *Southern Pacific Co.* v. *Arizona, supra,* and *Morgan* v. *Virginia, supra,* would suggest that no showing of burden on interstate commerce is sufficient to invalidate local

safety regulations in absence of some element of discrimination against interstate commerce.

The various exercises by the States of their police power stand, however, on an equal footing. All are entitled to the same presumption of validity when challenged under the Due Process Clause of the Fourteenth Amendment. *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; *Day-Brite Lighting, Inc.,* v. *Missouri,* 342 U. S. 421; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483. Similarly the various state regulatory statutes are of equal dignity when measured against the Commerce Clause. Local regulations which would pass muster under the Due Process Clause might nonetheless fail to survive other challenges to constitutionality that bring the Supremacy Clause into play. Like any local law that conflicts with federal regulatory measures (*California Comm'n* v. *United States,* 355 U. S. 534; *Service Storage & Transfer Co.* v. *Virginia,* 359 U. S. 171), state regulations that run afoul of the policy of free trade reflected in the Commerce Clause must also bow.

This is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce. This conclusion is especially underlined by the deleterious effect which the Illinois law will have on the "interline" operation of interstate motor carriers. The conflict between the Arkansas regulation and the Illinois regulation also suggests that this regulation of mudguards is not one of those matters "admitting of diversity of treatment according to the special requirements of local conditions," to use the words of Chief Justice Hughes in *Sproles* v. *Binford, supra,* at 390. A State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers

entering or crossing its territory. Such a new safety device—out of line with the requirements of the other States—may be so compelling that the innovating State need not be the one to give way. But the present showing—balanced against the clear burden on commerce—is far too inconclusive to make this mudguard meet that test.

We deal not with absolutes but with questions of degree. The state legislatures plainly have great leeway in providing safety regulations for all vehicles—interstate as well as local. Our decisions so hold. Yet the heavy burden which the Illinois mudguard law places on the interstate movement of trucks and trailers seems to us to pass the permissible limits even for safety regulations.

*Affirmed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

The opinion of the Court clearly demonstrates the heavy burden, in terms of cost and interference with "interlining," which the Illinois statute here involved imposes on interstate commerce. In view of the findings of the District Court, summarized on page 525 of the Court's opinion and fully justified by the record, to the effect that the contour mudflap "possesses no advantages" in terms of safety over the conventional flap permitted in all other States, and indeed creates certain safety hazards, this heavy burden cannot be justified on the theory that the Illinois statute is a necessary, appropriate, or helpful local safety measure. Accordingly, I concur in the judgment of the Court.