## Commonwealth v. Boltz

*Michael J. Perezous*, for defendant.

*Theodore A. Parker*, Assistant District Attorney, for Commonwealth.

BROWN, J., July 29, 1966.—In this proceeding, defendant, Thomas W. Boltz, has been prosecuted for the summary offense of operating a motor vehicle with a sifting or leaking load. Defendant was charged with violation of section 831 of The Vehicle Code of the Commonwealth of Pennsylvania, approved April 29, 1959, P. L. 58, sec. 831, which provides: "No vehicle

shall be driven or moved on any highway unless such vehicle is so constructed or loaded as to prevent its contents from dropping, sifting, leaking or *otherwise escaping* therefrom". (Italics added.) As a result of this charge, defendant waived a hearing before the justice of the peace and the case was heard by this court on February 25, 1966. Extensive testimony was taken at the hearing, and thereafter, pursuant to a motion for judgment of not guilty made by defendant, the case was argued before the court en banc.

The issue before the court in this case is as stated by defendant in his brief. Does the emission of chicken feathers from a vehicle by which live poultry is being transported constitute a violation of The Vehicle Code where there is no other practical, feasible and economic method of transporting chickens available, especially in light of the competitive nature of the industry, the role it plays in our economy, and the great consumer demand for the produce? Defendant, while transporting a load of chickens on a flat-bed semi-trailer being hauled by a truck tractor, was prosecuted by Trooper Joseph L. Monville, of the Pennsylvania State Police, for violation of the above quoted section 831 of The Vehicle Code of the Commonwealth of Pennsylvania, in that chicken feathers were being discharged from the trailer while the vehicle was in transit. This alleged offense occurred on September 15, 1965, on the route 230 bypass, at or near Lititz Pike, in Lancaster County, at about 8:25 a.m., E.S.T.

Trooper Monville testified that he noticed that there were quantities of chicken feathers blowing from the truck, in sufficient amount to cause him to state that there appeared to be "snow" coming from the end of the truck. In addition to the feathers, there were a few pieces of brown material, probably manure, seen dropping from the truck. The testimony of the prosecuting witness, Trooper Monville, established

that the semi-trailer was properly loaded, and that there was no slippage of the chicken crates. He further testified that not only did the feathers coming from the rear of the semi-trailer not impede his vision, but also that he had no knowledge that the feathers were impeding the vision of anyone else on the highway. The trooper also testified that in his opinion, ordinary screen door screening around the outside and the rear of the trailer would prevent any of the load from dropping on the highway.

Defendant testified that he is employed by C. F. Manbeck, Inc., a poultry processor, which firm hauls loads of chickens out of Maryland, Delaware, Virginia and Pennsylvania, and that this particular semi-trailer load was transporting chickens in coops according to the normal stacking procedure in effect throughout the entire United States of America; that is, eight crates or coops high with approximately 14 chickens per coop. The coops are one foot high by three feet long and two feet wide, and there is a wooden rung every two inches on the side of each coop. Defendant further testified that in his opinion, screen door screening would smother the chickens, since feathers would clog against it and shut off ventilation, and that quarter inch mesh screening would not impede the feathers at all. He further stated that burlap screening is used in the winter time to protect the birds from extreme cold weather, but is not used in the summer time because it would have the same effect as fine screening. Defendant contended that if the rungs would be moved as close together as a quarter inch apart, the same amount of feathers would escape.

Dr. Wilson L. Miller, a veterinarian practicing in poultry diseases, testified that the average temperature of a chicken is 106 degrees, and since the bird has no sweat glands, its body heat escapes by conduction through the skin. He testified that when chickens are

overheated, feathers have a tendency to loosen and that chicken feathers eventually disintegrate and, when ground up, are used for fertilizer. Dr. Miller further testified that in an average trailer load of 5,000 to 6,000 chickens between 8½ and 9½ weeks old, there are from a third to a half of them in some stage of moult (losing feathers), and that he doubts that any chicken crate could be easily developed to cut down the escape of feathers. While the load in the instant case was not indicated, it would appear that this was an average load.

Much testimony was then developed concerning the present method being used in the instant case as the only feasible one because of the profit motive and the principle of supply and demand for chicken consumption. It was testified that if a particular poultry processor hauled only one-quarter or one-half of a load of chickens on his semi-trailer, he could not compete with the rest of the industry; that there would also not be enough chickens to supply the demands of consumers; and instead of working 8 to 16 hours per day as they now do, the crews of workers would have to work 24 hours per day and still would not be able to satisfy the demand. In addition to this, it was testified that half loaded semi-trailers would then be on the highway all the time in order to attempt to satisfy consumers' demand.

In an effort to correct the situation of escaping chicken feathers, another defense witness testified that from a public relations standpoint, the practice of cleaning procedures was adopted by his company, and he testified with regard to the mechanical coop cleaning procedures used to clean excess feathers out of chicken coops and that, based on his 28 years of experience with the poultry industry, he stated that the Pennsylvania poultry industry has to continue transporting chickens in the same manner as being done

by defendant in this case in order to remain competitive with such other States as Georgia, North Carolina, South Carolina, Alabama, Maryland and Delaware. This witness further described detailed tests which have been tried to reduce the escape of feathers and that these tests were not successful to any appreciable extent, and that none of these experiments have been effective in retarding feathers from coming from a load as long as air is flowing through the load.

A witness from the Society for the Prevention of Cruelty to Animals of Pennsylvania indicated that chicken coops being used by defendant were the proper ones to avoid cruelty in poultry handling.

Finally, there was testimony that Pennsylvania ranks fourth among the States in the production of chickens and poultry produce; that Lancaster County ranks first among Pennsylvania counties in the production of chickens and eggs, and in this respect is one of the leading counties in the nation.

This case presents unusual problems, for although section 831 of The Vehicle Code, or provisions similar thereto, has been in effect since 1927 (Act of May 11, 1927, P. L. 886, art. VIII, sec. 818; Act of May 1, 1929, P. L. 905, art. VIII, sec. 821; 75 PS §831), there are very few recorded decisions dealing with the statute, and none on the applicability of the provision to this situation. Although the penalty provided by the statute is relatively light, the economic importance of this decision to poultry growers and processors throughout Pennsylvania is tremendous. As submitted by defendant, and attested to by the witness for the defense, it is impossible under present practices and methods for hauling poultry to prevent these feathers from escaping onto the highway, except in cold weather when burlap sides can be placed over the crates. This type of provision, which is designed to prevent dangerous objects from falling on the road and causing

hazards by obstructing the clear path of the motorist, seems to be fairly standard in many States. This court, by personal investigation, has determined that Maryland, for one, is another State with a like provision, but that the highway patrol of that State do not regard the blowing chicken feathers as being within the purview of the statute's words of "dropping, sifting," or "leaking".

Pennsylvania, of course, has the right to prescribe and enforce its highway safety laws as it deems necessary. The most litigated area of these highway provisions as applied to commercial carriers is that of violations of the weight limitations allowed on our highways. In this area, the Pennsylvania courts have guarded this privilege and have cared little for statutory provisions or enforcement practices of other States. In Commonwealth v. Reed, 51 York 73 (1937), the court announced a typical attitude in protecting this State's power to promulgate rules for those using the highways. In that case, a driver of a truck registered in Maryland was prosecuted for being 225 pounds over the Pennsylvania weight limitation, even though defendant claimed that he should not be so prosecuted because his home State's weight limitation was higher, and he would not have been violating the Maryland statute. Of this defense, the court at page 74 held: "The court is not impressed with this defense. In the situation presented we are not concerned with the laws of the State of Maryland. It can fix such limits of the size and weight of automobiles using the roads in that state as it sees fit; but this state has the right, privilege and power, and truck operators from other states using the roads of this Commonwealth must conform to our laws". Furthermore, this attitude of strict native power to prescribe weight limitations has been approved by the Supreme Court of the United States on many occasions, and this in the

face of varied arguments based upon denial of due process, discrimination against interstate commerce and imposition of a direct burden upon interstate commerce. See Sproles v. Binford, 286 U. S. 374, 52 S. Ct. 581 (1931).

In addition to weight limitations, the Supreme Court has approved State regulation of the width and length of vehicles. See South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U. S. 177, 58 S. Ct. 510 (1938), where the court upheld a South Carolina statute prohibiting the use of the highways by vehicles with a width of more than 90 inches, even though it was shown that from 85 to 90 percent of the motor trucks used in interstate commerce are of a standard width of 96 inches.

In light of these older cases and, in fact, the great majority of recent cases on point, it may generally be concluded that the Supreme Court of the United States is extremely reluctant to find an interference with interstate commerce when that interference is alleged to come from a State statute which has as its purpose highway safety. However, one recent case has found such interference, and because many factors in the court's decision in that case seem to correlate with facts in the present case, it is of special interest.

Bibb, Director of Public Safety of Illinois v. Navajo Freight Lines, Inc., 359 U. S. 520, 3 L. Ed. 2d 1003, 79 S. Ct. 962 (1959), involved an Illinois statute (Ill. Rev. Stat. 1957, c. 95½ §218b), which required that vehicles of the second division (those used for pulling or carrying freight) be equipped with contour splash guards or "mudflaps", very unlike the conventional straight, non-rigid guard. The section was applicable to vehicles moving in intrastate traffic as well as to those moving in interstate commerce, so no discrimination was found. Furthermore, no claim was made that the statute violated the due process clause or the

Fourteenth Amendment. However, because it was shown that the new design mudflap gave no great safety advantage; that it actually created new hazards by rendering the brakes less effective; that it increased the danger and probability that the guards would drop on the road; that the cost, per vehicle, to install the new guards was $30; and that the maintenance and replacement costs were higher for the new guard, the court sustained the claim that the requirement was an undue burden on interstate commerce and, therefore, unconstitutional. Still another factor in the unanimous decision of the court was that there was a possibility of conflict between State provisions. In his opinion, Mr. Justice Douglas, at page 529, stated: "A State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory. Such a new safety device—out of line with the requirements of the other States—may be so compelling that the innovating State need not be the one to give way. But the present showing—balanced against the clear burden on commerce—is far too inconclusive to make this mudguard meet that test". The court then concludes its opinion by stating: "We deal not with absolutes but with questions of degree. The state legislatures plainly have great leeway in providing safety regulations for all vehicles—interstate as well as local. Our decisions so hold. Yet the heavy burden which the Illinois mudguard law places on the interstate movement of trucks and trailers seems to us to pass the permissible limits even for safety regulations". To paraphrase this concluding paragraph of Bibb, this court feels that to consider that the statute in issue in this case was violated by the means in which the live chickens were being transported by defendant would

place too heavy a burden on the movement of the tractor-trailer, and seems to us to pass the permissible limits even for safety regulations in Pennsylvania.

This court feels that Pennsylvania, under its police power, is not insisting upon a radical design for chicken carriers by the terms of the statute under which defendant, Thomas W. Boltz, is being charged. But indirectly, this may be the result of a conviction here, for it was shown from the testimony that only through great expense and virtual complete redesign of chicken hauling vehicles can the problem of blowing feathers be avoided. Even though the enforcement of section 831 has not before been applied to poultry trucks and blowing feathers, and even though section 831 may never be applied to a similar situation again, the issue is too important to our local economy, as well as to that of the Commonwealth, to render an inconclusive decision. It may be possible to convict defendant on the basis of the manure which was also dropping from the truck, but this would be side-stepping the real issue.

In light of the Bibb decision, several facts proved by the testimony become important. It was not shown that blowing feathers, even in the large quantities which the trooper here observed, are in any way hazardous, or in any way injure the road surface. To the contrary, from the testimony it may be concluded that for a rural area the feathers may be beneficial as fertilizer. They do not remain on the road so as to detract from appearance (and thus injure our growing tourist business). The Bibb decision held that a cost of $30 per vehicle and the possibility that truckers would have to change mudguards at the various State lines was an undue burden. If we now force the poultry industry to contain harmless feathers within a truck, there may be an extremely high ceiling on the cost of converting to equipment that effectively produces this

result. In such an event, while vehicles from other States may avoid Pennsylvania's roads because they cannot meet the "no-blow" standard, and Pennsylvania truckers would have a virtual monopoly here, the cost of gaining this advantage could be fatal to the poultry industry. These standards are impractical. If new equipment is not provided, less chickens per load will be the rule; this will hurt the local industry just as much as a change to new equipment. The practices now employed have long standing and are used throughout the United States. Section 831 or its equivalent has been in effect since 1927, and at no time prior to the bringing of the instant prosecution has the poultry industry been involved in a similar alleged violation.

Section 58 of the Statutory Construction Act, May 28, 1937, P. L. 1019, 46 PS §558, provides that penal provisions of a law should be strictly construed, and the cases are many which have followed this rule. Either by a ruling that the blowing of feathers from live poultry is not a "dropping, sifting (or) leaking" and that the term "otherwise escaping" is too broad to include this unpreventable escape of feathers, or by a finding that the feathers of these chickens are not the main "contents" of the truck and are, therefore, not in the purview of the statute, this defendant should be acquitted.

It is not contended, by citation of the Bibb case, that section 831 should be declared unconstitutional by this court. Section 831 is almost a standard provision among the States, and it has some very great importance to highway safety. This case does not present such a situation, however. The truck was properly loaded as far as the crates were concerned, and only the pliable feathers escaped, with the addition of a possible few pieces of brown material, possibly manure, also escaping, the latter not being the real issue

in this case as hereinbefore stated. They did no cognizable harm to the motorist, to the highway, or to the countryside. Accordingly, the court sustains the motion for a judgment of not guilty and makes the following:

ORDER

And now, July 29, 1966, the court finds defendant, Thomas W. Boltz, not guilty of the offense of violating section 831 of The Vehicle Code of the Commonwealth of Pennsylvania, and directs that the costs of this proceeding shall be paid by the County of Lancaster.