PEOPLE v CONSOLIDATED RAIL CORPORATION

Docket No. 77663. Submitted May 7, 1985, at Grand Rapids.—Decided
September 16, 1985. Leave to appeal applied for.

Defendant, Consolidated Rail Corporation, was convicted in dis-
trict court of obstructing vehicular traffic on three occasions.
The defendant appealed to the Kalamazoo Circuit Court, which
affirmed, Richard R. Lamb, J. Defendant appealed by leave
granted, alleging that the statute which prohibits a railroad
from blocking a highway intersection for more than five min-
utes, as applied to the defendant, violates the Commerce Clause
of the United States Constitution. The statutory violations
involved occurred on a section of track which, because of its
construction, limits train speeds to 10 miles per hour. Defen-
dant argued that imposition of the statute impairs commerce
by requiring defendant to run shorter trains and, thus, more
trains, thereby increasing costs. On appeal, *held:*

The evidence presented by defendant concerned the applica-
tion of the statute only to the single location on defendant's
railroad track. The effect of the statute on this local circum-
stance is not so much of a burden on interstate commerce as to
violate the Commerce Clause. The statute is clothed with a
presumption of validity which the defendant has not overcome.
Affirmed.

1. COMMERCE — STATES — POLICE POWER.
A state may exercise its police powers over matters of local
concern even though the regulation affects interstate com-
merce, so long as the free flow of commerce is not impeded (US
Const, art I, § 8).

REFERENCES FOR POINTS IN HEADNOTES
[1] Am Jur 2d, Commerce §§ 83 *et seq.*
See the annotations in the ALR3d/4th Quick Index under Com-
merce.
[2, 3] Am Jur 2d, Highways, Streets, and Bridges §§ 199-212.
See the annotations in the ALR3d/4th Quick Index under High-
ways and Streets.
[3] Am Jur 2d, Railroads §§ 265-275.
See the annotations in the ALR3d/4th Quick Index under Rail-
roads.

2. COMMERCE — CONSTITUTIONAL LAW.

> One who challenges a highway safety regulation as violative of the Commerce Clause must overcome a strong presumption of validity; the court should uphold the law unless in the circumstances the total effect of the law as a safety measure is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it (US Const, art I, § 8).

3. RAILROADS — COMMERCE — CONSTITUTIONAL LAW.

> The statute which prohibits a railroad from blocking a highway intersection with a train for more than five minutes, as applied to a single railroad at a single location which, because of its peculiar characteristics, results in a limitation on the length of trains, does not violate the Commerce Clause by adversely affecting interstate commerce (US Const, art I, § 8; MCL 466.23; MSA 22.281[1]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *James J. Gregart,* Prosecuting Attorney, and *Michael H. Dzialowski,* Assistant Prosecuting Attorney, for the people.

*Marcoux, Allen & Beaman, P.C.* (by *Raymond E. McQuillan),* for defendant.

Before: SHEPHERD, P.J., and R. M. MAHER and W. R. PETERSON,* JJ.

SHEPHERD, P.J. Defendant was convicted in district court of permitting three of its trains to obstruct a street for a period longer than five minutes, MCL 466.23; MSA 22.281(1). Defendant unsuccessfully moved for dismissal on the ground that the statute, MCL 466.23, as applied to the instant matters, violated the Commerce Clause of the United States Constitution, Article I, § 8. The circuit court affirmed. This Court granted leave to appeal. We affirm.

The case involves street intersections along a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

stretch of railroad track known as the "Bottsford Curve" in Kalamazoo, Michigan. Defendant uses this section of track for 90 per cent of its Kalamazoo operations. Due to the 16-degree curve in this area, defendants' trains cannot move safely in excess of 10 miles per hour. At present, defendant can do nothing to eliminate the curve because it does not own enough of the adjoining real estate.[1]

In district court, defendant presented testimony that, based upon an average car length of 75 feet, a maximum of 58 cars can move through the relevant intersection in five minutes at the safe speed of 10 miles per hour. The three trains cited measured 162, 102 and 97 cars, respectively. Thus, to comply with the statute, defendant must reduce the number of cars in each train and, therefore, increase the number of trains. There was testimony that compliance would cause defendant the burden of securing additional locomotives, cabooses and personnel. A defense witness claimed these charges would constitute a "tremendous financial burden".

In addition, use of multiple trains would cause delays in product delivery, because the second or third train would arrive later. The witness stated that the trains would have to be "three to five hours" apart to provide a safe distance. This, as well as the increased overhead, would put defendant at a competitive disadvantage.

The same witness opined that an increase in the number of trains would result in an increase of the total time of obstruction of the intersection. The witness explained that, while a 100-car train might occupy the intersection for 10 minutes, additional trains (though shorter) would take longer total time because the crossing protections,

---

[1] A planned project would alleviate this difficulty, but has not yet been carried out.

including lights and gates, would activate for each individual train. These warnings begin 25 to 30 seconds before a train arrives.

The people submitted testimony that delays at railroad crossings can be critical when police officers respond to calls and when officers need assistance to make arrests. In addition, obstruction of intersections may delay the arrival of ambulances to the scene of an injury or illness. Time is a critical factor. An assistant fire chief gave similar views with respect to fire engines and paramedics. A five-minute delay can be fatal to a heart attack victim.

The district court found that the prosecution had "shown convincingly that these regulations are necessary and effective in reducing the response time of emergency vehicles". The court concluded "that the necessity for public safety outweights the interference" with interstate commerce.

Significantly, there is no evidence that any other railroad uses the "Bottsford Curve" (indeed, it appears defendant owns the track) or that any other railroad in the state is burdened by the five-minute limitation contained in MCL 466.23. As noted by the Circuit court:

"This Court has reviewed all of the facts established on that record. I have reviewed the appropriate law, cited the applicable standards, and I take note of the fact that this statute is not in and of itself directed to the regulation of interstate commerce. It is one concerning health and safety. The ten-mile-an-hour limitation which results in Conrail's inability to clear the crossings in five minutes, is not a State regulation. It is a self-imposed one because of the nature of the curve. Other railroads do not have this difficulty, but Conrail has. There is a tangential effect on Conrail in their business, but it is not such that it offends the Commerce Clause."

We must decide whether the five-minute limitation on obstruction of intersections unreasonably burdens interstate commerce.

States may exercise their police powers over matters of local concern, even though the regulation affects interstate commerce, so long as the free flow of commerce is not impeded. Whether a burden on interstate commerce is unconstitutional depends on "the nature and extent of the burden * * * and the state and national interests at stake". *Indiana & Michigan Power Co v PSC*, 405 Mich 400, 416; 275 NW2d 450 (1979). Those who challenge highway safety regulations by reference to the Commerce Clause must overcome a strong presumption of validity. *Raymond Motor Transportation, Inc, v Rice,* 434 US 429; 98 S Ct 787; 54 L Ed 2d 664 (1978); *Bibb v Navajo Freight Lines,* 359 US 520, 524; 79 S Ct 962; 3 L Ed 2d 1003 (1959). Unless in the circumstances "the total effect of the law as a safety measure in reducing accidents and casualties[2] is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it", the courts should uphold the law. *Bibb,* 359 US 524; *Southern Pacific v Arizona,* 325 US 761, 775-776; 65 S Ct 1515; 89 L Ed 1915 (1945). "[T]he inquiry necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor, supra,* 434 US 441. Nevertheless, this Court must uphold the statute "unless the burden imposed * * * is clearly excessive in relation to the putative local benefits". *Id.,* quoting *Pike v Bruce Church, Inc,* 397 US 137, 142; 90 S Ct 844; 25 L Ed 2d 174 (1970).

[2] Or, in the present case, reducing the danger of critical delays of police and other emergency assistance.

Defendant advances no evidence or argument that the statute burdens interstate commerce generally. Rather, defendant submits that, as applied to the Kalamazoo operations at the "Bottsford curve", the statute runs afoul of the Commerce Clause. Defendant cites no cases in which the argument of the party challenging a state statute was based solely on the effect of the regulation on that party's operations alone (much less only that party's operations at a single location within the state) and that argument was sustained. Rather, in assessing the burden on interstate commerce, the courts have been concerned with the effect of enactments on the national interest in the free flow of commerce.

The United States Supreme Court has always considered the effect of the regulation on the regulated industry as a whole. In *Raymond Motor, supra,* 434 US 445, the Court noted that Wisconsin's prohibition of double-trailer trucks imposed a substantial burden on interstate commerce, because all motor carriers engaged in such commerce were forced to haul "doubles" separately, travel around the state's borders or use single-trailer trucks instead. In *Bibb, supra,* the Court cited the "increased financial burdens for interstate carriers" which resulted from an Illinois requirement of contour mudguards. 359 US 525. Coupled with a conflicting Arkansas standard, the Illinois statute would require all carriers between the two states to interchange mudguards, "causing a significant delay in an operation where prompt movement [was] of the essence". 359 US 527.

Defendant relies heavily upon *Southern Pacific v Arizona, supra,* in which the Supreme Court struck down a statute limiting the number of cars in railroad trains. Defendant fails to mention that the Court's consideration of the burden on inter-

state commerce was weighted with a concern broader than the interests of the Southern Pacific Company alone:

"The findings show that the operation of long trains, that is trains of more than fourteeen passenger and more than seventy freight cars, is standard practice over the main lines of the railroads of the United States, and that, *if the length of trains is to be regulated at all, national uniformity in the regulation adopted, such as only Congress can prescribe, is practically indispensable to the operation of an efficient and economical national railway system.* On many railroads passenger trains of more than fourteeen cars and freight trains of more than seventy cars are operated, and on some systems freight trains are run ranging from one hundred and twenty-five to one hundred and sixty cars in length. Outside of Arizona, where the length of trains is not restricted, appellant runs a substantial proportion of long trains. In 1939 on its comparable route for through traffic through Utah and Nevada from 66 to 85% of its freight trains were over 70 cars in length and over 43% of its passenger trains included more than fourteen passenger cars.

"In Arizona, approximately 93% of the freight traffic and 95% of the passenger traffic is interstate. Because of the Train Limit Law appellant is required to haul over 30% more trains in Arizona than would otherwise have been necessary. The record shows a definite relationship between operating costs and the length of trains, the increase in length resulting in a reduction of operating costs per car. The additional cost of operation of trains complying with the Train Limit Law in Arizona amounts for the two railroads traversing that state to about $1,000,000 a year. The reduction in train lengths also impedes efficient operations. More locomotives and more manpower are required; the necessary conversion and reconversion of train lengths at terminals and the delay caused by breaking up and remaking long trains upon entering and leaving the state in order to comply with the law, delays the traffic and diminishes its volume moved in a given time, especially when traffic is heavy." 325 US 771-772. (Emphasis added.)

This is not to say that a regulation which adversely affects only one carrier or railroad is automatically constitutionally sound. However, defendant's restriction of its argument and proof to the effect of the application of the statute on its own competitive position, and the complete absence of proof as to an adverse effect on other interstate railroads, is surely relevant to the weight of the actual burden on interstate commerce. We are faced with a statute as applied to a single curve used by a single railroad. We are unconvinced that the Commerce Clause should be applied to such local circumstances, which have little relevance to "the interests of the nation in an adequate, economical and efficient railway transportation service". *Southern Pacific, supra,* 325 US 783-784.

Defendant's argument that application of the statute, together with the "Bottsford Curve", constitutes a *de facto* limitation on the length of its trains is not persuasive. Defendant has advanced no evidence that the state is somehow responsible for the curvature of the track. Therefore, this case differs from *Kahn v Southern R Co*, 202 F2d 875 (CA 4, 1953) (cited by defendant), in which the city had ordinances which limited both the time of obstruction of intersections and the speed of trains. In combination, these ordinances amounted to a governmental limitation on the length of trains, contrary to the holding in *Southern Pacific, supra.* Moreover, the ordinances applied to all railroad companies and to all intersections within the city.

In this case, we have, at most, a *de facto* limitation on the length of defendant's trains at but one location, a restriction resulting not from the state's regulation, but from the curvature of defendant's own track.

The courts of other states have upheld similar

limitations, based on evidence that they further the state's interest in public safety. In *People v Indiana Harbor Belt R Co,* 102 Ill App 3d 811, 818; 430 NE2d 104 (1981), the Court upheld a ten-minute limitation, noting that "an exception is made for circumstances beyond the control of the railroad". The Michigan statute has a similar exception for "accident or mechanical failure". MCL 466.25; MSA 22.281(3). The court also observed that, unlike the statute at issue in *Southern Pacific, supra,* the Illinois law had a "reasonable basis", since blockage of thoroughfares "may create very serious safety problems". 102 Ill App 3d 819. See, also, *Commonwealth v New York Central R Co,* 350 Mass 724; 216 NE2d 870 (1966); *City of Lake Charles v Southern Pacific Transportation Co,* 310 So 2d 116 (La App, 1975). In *New York Central,* the cited train was involved in a switching operation. The court upheld application of the state's five-minute railroad crossing limitation, stating, "there is presented a local problem without effect on national or interstate uniformity". 350 Mass 729; 216 NE2d 873.

The burden on interstate commerce, relegated solely to the effect on defendant's operations at one curve in a single city, is so slight that the presumption of validity is enough to sustain the statute. *Bibb, supra.* For the sake of completeness, we note that it is beyond doubt that the public safety, health and welfare often hinge on the amount of time taken by police officers, firemen and other personnel to arrive at the scene of a crisis. Nor can it be doubted that a train crossing at an intersection may pose an obstacle to such responses. The statute furthers these purposes, despite defendant's arguments to the contrary.

First, defendant urges that the statute forces it to use more trains and that two trains obstruct the

street longer than one. This ignores the fact that, as admitted by defendant, the two trains must be three to five hours apart for safety reasons. Obviously, an emergency vehicle will not have to wait as long for either of the two shorter trains as it would for the single, longer train. The people submitted testmony that every minute is critical. "If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective." *Bibb, supra,* p 524.

Defendant also argues that a larger number of trains increases the risk of mechanical failure and that such failures also cause obstructions of the street.[3] However, defendant submitted no proof as to the chances that a locomotive will become disabled while it blocks this particular street. In fact, there is no evidence that this one crossing (again, the only railroad crossing relevant to the constitutional issue) has ever been occupied by a disabled train.

We conclude that defendant has not overcome the presumption of validity attached to the statute or the state's interest in facilitating timely responses to emergencies. Accordingly, we agree with the result reached by the district and circuit courts.

Affirmed.

---

[3] Of course, the added risk of mechanical failure alleged by defendant adds nothing to the burden on interstate commerce, given the statutory exception contained in MCL 466.25.