OPINION OF THE COURT
 

 Bellacosa, J.
 

 In this CPLR article 78 proceeding, petitioner-appellant Reuters Limited challenges a corporate franchise tax deft
 
 *114
 
 ciency assessment. At issue is whether New York State’s calculation of petitioner’s franchise tax on the basis of the worldwide net income apportionment method violates the nondiscrimination clause of the United States-United Kingdom Tax Treaty (Convention Between United States and United Kingdom for Avoidance of Double Taxation, Dec. 31, 1975, 31 UST 5668). We agree with the conclusion of the Appellate Division that application of New York’s apportionment formula to the worldwide net income of a single multijurisdictional business enterprise, operating internationally, does not violate the Treaty’s nondiscrimination clause. The Appellate Division judgment, confirming the determination of the Tax Appeals Tribunal and the Commissioner of Taxation and Finance, should be affirmed.
 

 Reuters Limited, a corporation organized in the United Kingdom, does business in approximately 80 countries. During taxable years 1977 through 1979, it maintained a branch office in New York City, which served as its principal United States office. Although Reuters earned profits abroad during the tax years in question, its New York branch incurred losses. Reuters computed its corporate franchise taxes for the tax years 1977 through 1979 on the basis of United States income only, and paid no franchise tax for those years because it also claimed losses on its United States operations. In 1983, the Department of Taxation and Finance performed an audit using the worldwide net income apportionment method and issued notices of deficiency totalling $1,280,000 for the tax years 1977 through 1979. The parties eventually compromised the deficiency amount down to $96,168.
 

 Irrespective of the modification as to the amount owed, Reuters filed an administrative petition challenging the deficiency itself. An Administrative Law Judge sustained the notices of deficiency. After the Tax Appeals Tribunal affirmed the Administrative Law Judge’s determination, Reuters commenced this article 78 proceeding seeking to annul the determination of deficiency. The Appellate Division unanimously confirmed the determination and dismissed the petition in a well-reasoned opinion by Justice Paul Yesawich, Jr. After this Court dismissed an appeal taken as of right on the ground that no substantial constitutional question was directly involved (80 NY2d 971), we granted Reuters leave to appeal.
 

 I.
 

 When computing the corporate franchise tax of a multijuris
 
 *115
 
 dictional international entity doing business in New York, an apportionment formula is used to determine the aliquot share of the corporation’s worldwide net income attributable to New York. The first step is to calculate a "business allocation percentage”, which is ascertained by comparing the value which the corporation’s real and tangible personal property within New York bears to the worldwide value of the same factors (Tax Law § 210 [3] [a] [1]). The corporation’s worldwide business income is then multiplied by the business allocation percentage to arrive at the entire net income base, i.e., the portion of the taxpayer’s entire net income allocable to and taxable by New York
 
 (id.,
 
 § 210 [3] [a]; [1] [a]). New York’s corporate franchise tax is computed at the rate of 9% of the taxpayer’s entire net income base
 
 (id.,
 
 § 210 [1] [a]).
 

 Article 24 (2) of the U.S.-U.K. Tax Treaty, the antidiscrimination tax clause at the heart of this dispute, provides:
 

 "The taxation on a permanent establishment which an enterprise of a Contracting State has in the other Contracting State
 
 shall not be less favourably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities”
 
 (31 UST 5668, 5687 [emphasis added]).
 

 Article 24 (2) is made applicable to the political subdivisions of the Contracting States through article 2 (4).
 

 Initially, we are in agreement with the Appellate Division’s observation that the language of the antidiscrimination clause is ambiguous. Specifically, it is unclear whether the truncated phrase "carrying on the same activities” requires that the foreign subject of comparison for assessing discrimination be the permanent establishment (branch) or the corporate enterprise of which the permanent establishment is a part. Reuters would have the courts construe article 24 (2) as requiring that claims of discriminatory treatment be analyzed by comparing the taxation levied on its New York branch (permanent establishment) with the taxation levied on a hypothetical New York corporation (enterprise of that other State) carrying on business only in New York and conducting activities similar to those carried on by Reuters at its New York branch. Reuters further contends that the Treaty test for discrimination requires that its New York branch be treated for tax purposes as an enterprise discrete from the corporate parent
 
 *116
 
 in the United Kingdom. Under Reuters’ construction of the critical clause, a hypothetical New York corporation that earned no income outside this State would not be subject to the worldwide net income apportionment method. Thus, Reuters argues that its New York branch has been treated "less favourably” than required by article 24 (2) of the Treaty.
 

 The syllogism fails. Reuters-New York, as a branch of the United Kingdom enterprise, is not juridically equivalent to a free-standing entity as proposed in its hypothetical analogy. Reuters-New York cannot be lifted out of and placed in the isolation of its own legal universe, for the tax and juridical realities under the antidiscrimination clause are otherwise. As the Appellate Division aptly noted, a branch office "has no corporate or jurai identity separate from the corporation of which it is a part”
 
 (Matter of Reuters Ltd. v Tax Appeals Tribunal,
 
 180 AD2d 270, 272). Moreover, the purpose of the nondiscrimination clause is to protect foreign taxpayers against local economic discrimination derived from disparate tax treatment. The ultimate taxpayer here is the corporate entity, Reuters-United Kingdom, not its branch affiliate. Thus, to measure the potential discriminatory effect of New York’s franchise tax, by reference to Reuters’ New York branch as an enterprise discrete from its juridical parent, is not supportable under the language or purpose of the nondiscrimination clause. We conclude that Reuters-United Kingdom (enterprise) and its New York branch office (permanent establishment) are a single, inseparable business enterprise for franchise tax purposes.
 

 Reuters’ contention that Treaty article 24 (2) requires that its New York business activities be considered in isolation also amounts to a flank attack on the "unitary business” principle. The United States Supreme Court, however, has upheld and described that principle as "the linchpin of apportionability in the field of state income taxation”
 
 (Mobil Oil Corp. v Commissioner of Taxes,
 
 445 US 425, 439). Due to the increasingly intricate integration of national and international multijurisdictional corporations, the task of territorially tracking business income to discrete and remote sources has become an elusive endeavor. States have justifiably adopted formulary income apportionment methods to ascertain the income actually earned in a taxing jurisdiction by an integrated business enterprise operating multijurisdictionally. As a counterbalance to the insatiable and inventive quest for revenues, however, the measures undertaken must, of course, satisfy
 
 *117
 
 constitutional and organic law safeguards, and courts must factor in such concerns when resolving challenges to and disputes arising out of the various methodologies
 
 (see, Container Corp. v Franchise Tax Bd.,
 
 463 US 159, 164-166).
 

 We are unable to accept Reuters’ contention that a New York corporation carrying on business solely in New York is the equivalent domestic subject of comparison (enterprises of another State) for measuring discrimination under the Treaty. An "enterprise” is defined in article 3 (1)
 
 (d)
 
 of the Treaty as "an industrial or commercial undertaking carried on by a resident of a Contracting State” (31 UST 5671). A "resident of a Contracting State” is in turn defined as a United States or United Kingdom corporation (art 3 [1]
 
 [i];
 
 art 4 [1] [31 UST 5672-5673]). Making use of the appropriate Treaty definitions, we conclude that the domestic subject of comparison under the Treaty is an industrial or commercial undertaking carried on by a United States corporation. When the commercial undertaking is the branch office of a United States corporation, we reiterate that the branch and the corporation are a single business enterprise for franchise tax purposes. That analysis provides the correct comparability for the controversy at hand.
 

 In sum, our analysis leads us to agree with the Appellate Division that "the nondiscrimination clause requires a comparison * * * between the taxation of [Reuters’] United States branch located in New York and the taxation of a United States corporation having a branch in New York and conducting international business through branch offices in other countries”
 
 (Reuters,
 
 180 AD2d, at 273-274,
 
 supra).
 
 Employing this comparison, we note that New York’s calculation of Reuters’ franchise tax on the basis of worldwide net income apportionment results in nondiscriminatory tax treatment. Accordingly, we hold that article 24 (2)’s requirement of no less favorable treatment has been satisfied.
 

 The Treaty’s legislative history also buttresses this conclusion. Article 9 (4) of the Treaty, which the Senate ultimately refused to ratify, originally prohibited States from employing the California-type worldwide combined reporting methodology. That practice involves application of an apportionment formula to the combined worldwide income of related corporate affiliates and subsidiaries. The legislative history surrounding article 9 (4) discloses that State use of worldwide formulary apportionment methods as applied to a single busi
 
 *118
 
 ness enterprise would remain unaffected by the proposed Treaty restriction. The Senate Foreign Relations Committee’s Report on the Treaty states:
 

 "[I]f a U.S. branch of a British corporation does business in a state, that state cannot apply [California’s] unitary method to combine the income
 
 * * * of
 
 any related foreign enterprises * * * with those of that British corporation in determining the income of its U.S. branch which is taxable by that state.
 
 However, that state may take into account the income and assets of any other branches of that corporation, wherever located, because a corporation is considered to be a single enterprise regardless of how many separate branches or businesses it has”
 
 (Senate Executive Report No. 95-18, 1980-1 CB 411, 420 [emphasis added]).
 

 The Treasury Department’s technical explanation of the Treaty also reflects the view that article 9 (4)’s prohibition on State taxation was not to extend to the single enterprise modus operandi:
 

 "Because a corporation is considered a single enterprise regardless of how many branches it has, a State may take into account the income and assets of all branches of that corporation, wherever located” (Treasury Department Technical Explanation, 1980-1 CB 455, 462).
 

 While we do not presume to review or pass on the validity of any other tax schemes, the argument that the Treaty’s drafters intended article 24 (2) as an indirect curtailment on the open and widespread use of worldwide income apportionment methods strains credulity and proper interpretation. Forty-one States, including New York, currently apply an apportionment formula to the worldwide net income of a single business enterprise operating multijurisdictionally
 
 (see,
 
 Note,
 
 Desperate for Revenue: The States’ Unconstitutional Use of the Unitary Method to Apportion the Taxable Income of Foreign Parent Corporations,
 
 19 Hastings Const LQ 1077, 1080-1081). Four other States, including California, apply an apportionment formula to the combined worldwide income of related corporations operating multijurisdictionally
 
 (id.).
 
 In fact, the Treaty expressly denies the Federal Government the power to use formulary apportionment in article 7 (2) and is tellingly silent in that regard with respect to the States’ longstanding power and their varied implementation.
 

 
 *119
 
 II.
 

 In a separate argument, Reuters claims that New York’s use of worldwide net income apportionment violates the Foreign Commerce Clause (US Const, art I, § 8). In
 
 Bass, Ratcliff & Gretton v Tax Commn.
 
 (266 US 271), the Supreme Court of the United States rejected a Foreign Commerce Clause challenge to the validity of New York’s apportionment methodology on similar facts. Bass, a British corporation with worldwide net income exceeding $2,000,000 for the tax year in question, maintained a branch office in New York that had no net income for the same period. The New York Tax Commission allocated a share of Bass’s worldwide income to New York and assessed a franchise tax on the allocated amount. The United States Supreme Court held that New York’s use of worldwide income apportionment did not burden foreign commerce
 
 (id.,
 
 at 282-283). The Supreme Court noted that Bass was carrying on a unitary business "in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places”
 
 (id.,
 
 at 282). The Court ruled that New York was justified in attributing to itself "a just proportion of the profits earned by the Company from such unitary business”
 
 (id.). Bass
 
 has been reaffirmed by modern Supreme Court tax jurisprudence
 
 (see, Mobil Oil Corp. v Commissioner of Taxes,
 
 445 US 425, 438-439,
 
 supra).
 

 In this respect, we also observe that Reuters argues that New York’s statutory income apportionment technique imposes unconstitutionally discriminatory compliance costs on foreign commerce. The Appellate Division basically rejected Reuters’ argument on this issue for failure of sufficient factual showing: "[T]he averment * * * that the cost of compliance would be nearly $1 million per year is sorely undermined by the fact that [Reuters] was able to promptly supply information to the Tribunal to reduce the deficiencies initially indicated”
 
 (Reuters,
 
 180 AD2d, at 275,
 
 supra).
 
 Thus, we cannot and need not speculate on whether the cost of complying with New York’s tax methodology unconstitutionally burdens foreign commerce
 
 (but see, Bibb v Navajo Frgt. Lines,
 
 359 US 520, 526).
 

 Because the constitutional challenge in this case runs into such relevant stare decisis barriers and falters also on an essentially unsatisfied fact-qualifying threshold, this Court need not discuss further the merits of the constitutional
 
 *120
 
 objection. We note, also, that we previously dismissed the appeal taken as of right by Reuters on constitutional grounds, which we found jurisdictionally wanting.
 

 Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Hancock, Jr., and Smith concur; Judge Levine taking no part.
 

 Judgment affirmed, with costs.