**EXECUTIVE TOWN & COUNTRY SER-VICES, INC., a Georgia Corporation, Plaintiff-Appellant,**

v.

**CITY OF ATLANTA, a Municipal Corporation, Andrew Young, in his capacity as the Mayor of the City of Atlanta, George Napper, in his capacity as Commissioner of the Department of Public Safety, Abdul Haadee Muhammed, in his capacity as Director of the Bureau of Taxicabs & Vehicles for Hire, Morris Redding, in his capacity as Chief of the Bureau of Police Services and Carolyn Long Banks, in her capacity as Councilmember of the City of Atlanta, Defendants-Appellees,**

Sun Belt Limousine, Inc., Intervenor-Appellee.

Nos. 85–8396, 85–8444.

United States Court of Appeals, Eleventh Circuit.

May 23, 1986.

Robert J. Dorfman, Atlanta, Ga., for plaintiff-appellant.

Herbert P. Schlanger, Roy Mays, George Ference, Atlanta, Ga., for defendants-appellees.

Before VANCE and JOHNSON, Circuit Judges, and BOWEN *, District Judge.

BOWEN, District Judge:

Executive Town & Country, Inc. ("Town & Country") brought this action for injunctive and declaratory relief against the defendants from enforcing § 14–8020(g) and § 14–8218 of the Code of Ordinances of the City of Atlanta. Section 14–8020(g)[1] regulates the fares which licensed limousine service companies may charge for trips to and from the Atlanta Hartsfield Airport. Section 14–8218[2] prohibits the advertising

---

* Honorable Dudley H. Bowen, Jr., U.S. District Judge for the Southern District of Georgia, sitting by designation.

1. Section 14–8020(g) provides:

Fares which a limousine service shall charge for limousine rental shall be not less than $25.00 per hour, nor more than $60.00 per hour; fares for an extended limousine shall not be less than $25.00 per hour, per vehicle, nor more than $60.00 per hour, per vehicle. A limousine service, an extended limousine service, sedans, and vans, may not charge fares based upon fractions of an hour except after the second hour of service. The above schedule of rates not-with-standing, limousines, extended limousines, sedans, and vans travelling between the Atlanta International Airport and to points in and beyond the downtown Atlanta convention area, so long as such points are within the legal limits of the City of Atlanta, shall charge not less than $50.00 per limousine or extended limousine trip, not less than $40.00 per sedan trip and not less than $40.00 per van trip.

2. Section 14–8218 provides:

It shall be unlawful:

(a) for any person or corporation to knowingly operate or permit another to operate a limousine service in the City in violation of this article;

(b) for any person or corporation not holding a certificate under this article to hold himself or itself out to the public or advertise that it or he renders a limousine service in the City; or

(c) for any person or corporation to advertise rates for limousine service which are not in compliance with the regulations governing rates contained in this Chapter.

of any fares that are not in compliance with the provisions of § 14–8020(g). Town & Country, a duly licensed limousine transportation company operating within the corporate limits of Atlanta, contends that these ordinances are violative of the commerce clause and fourteenth amendment of the United States Constitution. *See, e.g., Park'n Fly of Texas, Inc. v. City of Houston,* 327 F.Supp. 910 (S.D.Tex.1971). Town & Country also claims that the ordinances are violative of federal antitrust laws.

The federal district court for the Northern District of Georgia temporarily restrained the City of Atlanta from enforcing §§ 14–8020(g) and 14–8218 as to Town & Country. After a bench trial, the district court dissolved the restraining order and found in favor of the defendants on all counts. It is from that final order that Town & Country appeals. 28 U.S.C.A. § 1291. We AFFIRM.

**I**

A threshold question in this appeal is whether Town & Country's limousine service is a part of interstate commerce. The commerce clause[3] to the United States Constitution restricts states and municipalities from imposing unreasonable burdens on interstate commerce. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471, 101 S.Ct. 715, 727–28, 66 L.Ed.2d 659 (1981); *Philadelphia v. New Jersey,* 437 U.S. 617, 621–24, 98 S.Ct. 2531, 2534–36, 57 L.Ed.2d 475 (1978). If Town & Country's limousine business does not constitute a part of interstate commerce, the court will not interfere with the city's legitimate exercise of its police powers.[4] *Airport Taxi*

*Cab Advisory Committee v. City of Atlanta,* 584 F.Supp. 961, 964–65 (N.D.Ga.1983); *c.f., United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

Town & Country argues that it is a part of interstate commerce. Approximately ninety percent (90%) of Town & Country's business consists of prearranged trips to and from the Atlanta Hartsfield International Airport. It naturally follows that at least ninety percent of Town & Country's passengers are making or completing interstate journeys. The fact that Town & Country's limousines may operate wholly within the State of Georgia does not, in and of itself, take Town & Country out of the stream of interstate commerce.[5] *Charter Limousine v. Dade County Board of County Commissioners,* 678 F.2d 586, 589 (5th Cir., Unit B, 1982).[6]

The district court assumed, for the purpose of its final order, that Town & Country was a part of interstate commerce. *Executive Town & Country Services, Inc. v. City of Atlanta,* No. C85–2499A, slip op. at 4 (N.D.Ga. May 21, 1985). Because the court would have reached the same result regardless of whether *vel non* Town & Country is a part of interstate commerce, the court below decided that it did not need to resolve that issue. It is necessary for our review of this case, however, that the issue of whether Town & Country is a part of interstate commerce be resolved.

◼ Generally, taxicab service between airports and businesses and homes is not within the stream of interstate commerce. *United States v. Yellow Cab Co.,* 332 U.S.

---

3. "The Congress shall have power … to regulate Commerce … among the several states…." U.S. Const., Art. I, § 8, Cl. 3.

4. The City of Atlanta "has specific authority from the State of Georgia to 'regulate and license vehicles for hire in the city; [and] to limit the number of such vehicles.' Appendix I, Paragraph 37 of the *Charter of Atlanta;* Ga.L.1973, p. 2188, Act. No. 53." *Airport Taxi Cab Advisory Committee v. City of Atlanta,* 584 F.Supp. 961, 965 (N.D.Ga.1983). *See infra* note 13.

5. "When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey

consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character." *United States v. Yellow Cab Co.,* 332 U.S. 218, 228, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010 (1947).

6. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34.

at 230–33, 67 S.Ct. at 1566–68; *Evanston Cab Co. v. City of Chicago*, 325 F.2d 907 (7th Cir.1963); *Airport Taxi Cab Advisory Committee v. City of Atlanta*, 584 F.Supp. at 964. The typical taxicab service to and from an airport is only "casual and incidental" to the taxicab's normal course of business, which is to service the needs of any passenger requesting transportation, not just those passengers traveling on an interstate journey. *United States v. Yellow Cab Co.*, 332 U.S. at 231–32, 67 S.Ct. at 1567; *c.f., Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–86, 95 S.Ct. 2004, 2011–12, 44 L.Ed.2d 572 (1975). A taxicab does not transform into an integral part of interstate commerce if, within the scope of its normal course of independent local service, the passenger happens to be beginning or completing an interstate trip. *Id.*, 332 U.S. at 233, 67 S.Ct. at 1568.

■ Town & Country's limousine service is distinguishable from the typical taxicab service discussed above. The vast majority of Town & Country's business consists of prearranged trips to and from the Atlanta Hartsfield International Airport. The district court found that:

> [m]any of these trips are for multi-national corporate clients. [Town & Country] receives reservations both on a local telephone number and two 800 number lines. [Town & Country] receives approximately twenty-one thousand incoming calls per year on the 800 numbers for limousine service. Most of [Town & Country's] business, though, is arranged within the State of Georgia through local numbers. Some passengers are picked up at the airport without having made a reservation and [Town & Country] advertises in the Atlanta airport to attract customers. [Town & Country] has a referral sister company in Chicago.

*Executive Town & Country Services, Inc. v. City of Atlanta*, No. C85–2499A, slip op. at 3–4 (N.D.Ga. May 21, 1985). We have reviewed the evidence in this case and are satisfied that Town & Country has established the nexus between its business and interstate commerce as required by *Yellow Cab* and its progeny.

## II

■ The issue involved *sub judice* is whether the city can regulate the minimum fare for limousine service to and from the airport.[7] At the outset, it is important to note that the commerce clause "protects the interstate market, not particular firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978). The scope of the commerce clause includes legislation related to local concerns if the legislation imposes an unreasonable burden on interstate commerce. *See, e.g., Minnesota v. Clover-Leaf Creamery Co.*, 449 U.S. at 470–71, 101 S.Ct. at 727–28; *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2535; *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 445–46, 98 S.Ct. 787, 796, 54 L.Ed.2d 664 (1978); *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 350, 97 S.Ct. 2434, 2444–45, 53 L.Ed.2d 383 (1977); *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976); *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959); *Southern Pacific Co. v. Arizona ex. rel. Sullivan*, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945). We will uphold a state regulation if it regulates "evenhandedly," if it imposes only an "incidental" burden on interstate

7. Town & Country does not challenge, and we will not address, the city's right to regulate fares in general. Moreover, at oral argument, Town & Country argued that § 14–8020(g), *see supra* note 1, established a minimum fare which was too high for the limousine service to charge its passengers without losing business. Town & Country, however, conceded that a lower minimum fare would not be objectionable. If, indeed, Town & Country is only concerned with the actual amount established as a minimum fare by the city, this court will not substitute its judgment for that of the legislature. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981).

commerce, and if the "burden imposed on such commerce is [not] clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Furthermore, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.; Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 471–73, 101 S.Ct. at 727–29; *Hughes v. Oklahoma,* 441 U.S. 322, 331, 99 S.Ct. 1727, 1733–34, 60 L.Ed.2d 250 (1979).

▪ Town & Country contends that the City's new rate structure for limousine service unreasonably burdens interstate commerce for a number of reasons. First, the interstate traveler who desires to be transported in a limousine now must pay $50.00 instead of the former fare of $18.00. Second, Town & Country argues that the increased price for limousine service somehow will result in a decrease in the city's tourism trade. Third, Town & Country argues that the new regulations will allow the taxicab industry to regain a portion of the transportation market that the limousine service had held as a result of competition in the free market. The present situation, it is argued, will burden interstate commerce because the interstate traveler will have no choice but to ride with a transporter which the traveler had chosen not to use when there were no minimum fare regulations for limousine service.

None of these arguments explains how the minimum fare regulations for limousine service burden interstate commerce. As explained above, our inquiry is limited to whether interstate commerce in general, and not a particular entity, is burdened by the regulations promulgated by the City of Atlanta. *Exxon Corp. v. Governor of*

*Maryland,* 437 U.S. at 127–28, 98 S.Ct. at 2215. These regulations may force the interstate travelers to choose between the more expensive, luxurious limousine service and a less expensive and arguably less comfortable mode of transportation. There is no evidence that interstate travelers will have to alter their plans, or that interstate travelers will be affected in any other significant way by the minimum fare regulations.

Any burden that these regulations might impose on interstate commerce is, at most, incidental. The district court concluded (and we agree) that, while the city's reasons for imposing the minimum fares are weak,[8] the burden imposed on interstate commerce by these regulations is not in excess of the putative benefits to be gained by the City of Atlanta. In light of the lack of evidence produced with respect to the burden imposed on interstate commerce, the district court has applied the law correctly.

### III

Town & Country also attacks the legislative rationale for the regulations under the fourteenth amendment. The Court will apply the "rational basis" test to determine if the legislative intent for the regulations passes constitutional muster. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 461, 101 S.Ct. at 722. Under this analysis, Town & Country has the burden of proving that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the" Atlanta City Council. *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). We will not substitute our judgment for that of the council. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 469, 101 S.Ct. at 726; *Ferguson v.*

---

8. The appellees argue that the fare regulation ensures:

(1) that each of [the different] modes of transportation can find a niche in which to fit in the City's transportation network; (2) that everyone within the City, no matter what his level of affluence, has affordable transportation available; (3) that the operators of each type of transportation [must] earn enough to permit them to meet the operational requirements (e.g., insurance, maintenance, etc.) which have been set by the City; and (4) that each of these different modes will be able to attract the custom of a sufficient number of patrons to maintain its economic viability. Appellee Sun Belt Limousine, Inc.'s Brief at 9.

*Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963); *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938).

■ The city's reasons for legislating these minimum fare regulations[9] are not very compelling in a free market system. Under the commerce clause, regulations cannot run afoul of the policy of free trade in their effect. *Bibb v. Navajo Freight Lines,* 359 U.S. at 529, 79 S.Ct. at 967. Regulations struck down under this principle have left no doubt that they are violative of the commerce clause. For example, in *Bibb,* the Supreme Court struck down an Illinois statute which required trucks and trailers operating on Illinois' highways to be equipped with a rear fender mudguard which would be illegal in Arkansas and which differed from that required in forty-five other states. Such a requirement would interfere with interline operations of motor carriers. The Illinois regulation unduly burdened interstate commerce in violation of the commerce clause.

In *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), at issue was a prohibition of trucks longer than fifty-five feet or pulling more than one vehicle to be operated within Wisconsin without a permit. The Supreme Court held that this regulation was violative of the commerce clause because it imposed a substantial burden on interstate commerce, and it made no more than the most speculative contribution to highway safety.

■ In the case *sub judice,* the City of Atlanta's reasons for enacting these regulations passed the "rational basis" test, albeit with little room for comfort. Moreover, Town & Country has not satisfied its burden of proving that there is no possible legislative rationale for enacting these regulations. Any equal protection claim raised by Town & Country under the four-teenth amendment also must fall under this analysis.

## IV

Finally, Town & Country alleges that the City of Atlanta violated the Sherman Act, 15 U.S.C.A. § 1 *et seq.,* by entering into a conspiracy to regulate Town & Country out of existence, and by regulating and restraining Town & Country's business. *See, e.g., Woolen v. Surtran Taxicabs, Inc.,* 461 F.Supp. 1025 (N.D.Tex.1978). In this nation's economy, free market "competition is generally recognized as resulting in the public good, [but] there are situations where restraints are appropriate." *Airport Taxi Cab Advisory Comm. v. City of Atlanta,* 584 F.Supp. at 965. *See also Fisher v. City of Berkeley,* — U.S. —, —, 106 S.Ct. 1045, 1047–48, 89 L.Ed.2d 206 (1986), *affirming* 37 Cal.3d 644, 209 Cal.Rptr. 682, 693 P.2d 261 (1984) ("the function of government may often be to tamper with free markets, correcting their failures and aiding their victims"). Furthermore, actions taken by states and municipalities are treated differently than private actors under the Sherman Act. *Town of Hallie v. City of Eau Claire,* — U.S. —, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *Parker,* the Court held that a state, acting through its legislature, is beyond the reach of the Sherman Act antitrust laws based on the principles of federalism and state sovereignty.[10] *Parker v. Brown,* 317 U.S. at 350–51, 63 S.Ct. at 313. The Supreme Court later refused to extend this exemption to municipalities because cities are not themselves sovereign. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 412–13, 98 S.Ct. 1123, 1136–37, 55 L.Ed.2d 364 (1978), (opinion of Brennan, J.). The Court, however, left open the possibility that a municipality could obtain an exemption from the antitrust laws if it demonstrates that anticompetitive conduct

9. *See supra* note 8.

10. "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as a sovereign." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 790, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975).

was authorized by the state "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137; *See also Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). "[A] state policy that expressly *permits,* but does not compel, anticompetitive conduct may" satisfy this requirement. *Southern Motor Carriers Rate Conference v. United States,* —— U.S. ——, 105 S.Ct. 1721, 1729, 85 L.Ed.2d 36 (1985).

■ The state policy giving rise to the anticompetitive activity need not be expressly articulated if the statute provided for a regulatory scheme that inherently "displace[s] unfettered business freedom." *New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 109, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978). A state legislature is not expected to expressly state "in a statute or its legislative history that [the legislature] intends for the delegated action to have anticompetitive effects." *Town of Hallie v. City of Eau Claire,* —— U.S. at ——, 105 S.Ct. at 1719. Otherwise, the federal courts would be "embroil[ed] ... in

the unnecessary interpretation of state statutes." *Id.* at n. 7. Furthermore, "it would undercut the fundamental policy of *Parker* and the state action doctrine of immunizing state action from federal antitrust scrutiny. See 1 P. Areeda & D. Turner, Antitrust Law, § 212.3(b) (Supp.1982)." *Id.* See also, *Auton v. Dade City, Fla.,* 783 F.2d 1009 (11 Cir., 1986).

In *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court held that, where the anticompetitive conduct is by private parties, it must be actively supervised by the state. When, however, the actor is a municipality, active supervision is not required once it is established that state authorization exists. *Town of Hallie v. City of Eau Claire,* —— U.S. at ——, 105 S.Ct. at 1720–21.

■ In the case at bar, there is no doubt that the City of Atlanta was authorized by the State of Georgia to regulate the rates for public transportation. *See* O.C.G.A. §§ 46–7–18 [11], 46–7–19 [12]. Historically the city has regulated public transporters pursuant to the police power granted the city by the State of Georgia.[13] *Air-*

---

**11.** O.C.G.A. § 46–7–18 provides:

The commission shall prescribe just and reasonable rates, fares, and charges for transportation by motor common carriers of passengers, baggage, and property and for all services rendered by motor common carriers in connection therewith. The tariffs therefor shall be in such form and shall be filed and published in such manner and on such notice as the commission may prescribe. Such tariffs shall also be subject to change on such notice and in such manner as the commission may prescribe. In order to carry out the purposes of this Code section, including the publication and maintenance of just, reasonable, and nondiscriminatory rates and charges, the commission shall establish a collective rate-making procedure for all transportation for which it has heretofore prescribed rates. Failure on the part of any motor common carrier to comply with this Code section or the rules and regulations promulgated under this Code section may result in suspension or cancellation of said carrier's operating authority by the commission.

**12.** O.C.G.A. § 46–7–19 provides:

No motor common carrier shall charge, demand, collect, or receive a greater or lesser or

different compensation for the transportation of passengers and property or for any service rendered in connection therewith than the rates, fares, and charges prescribed or approved by order of the commission; nor shall any motor common carrier unjustly discriminate against any person in its rates, fares, or charges for service. The commission may prescribe, by general order, to what persons motor common carriers may issue passes or free transportation; may prescribe, upon the same terms and conditions as apply to railroad carriers, reduced rates for special occasions; and may fix and prescribe rates and schedules.

**13.** The corporate powers of the city shall include the following:

(37) To regulate and license vehicles operated for hire in the City; to limit the number of such vehicles; to require the operators thereof to be licensed; to require public liability insurance on such vehicles in amounts prescribed by ordinance; to regulate and rent parking spaces in public ways for the use of such vehicles; to regulate transportation lines and terminals, pedestrian and vehicle traffic, parking and common carriers[.]

Charter of the City of Atlanta, App. I, § 37 (1973 Ga.Laws 2188, 2260).

port Taxi Cab Advisory Committee v. City of Atlanta, 584 F.Supp. at 963. Thus, the City of Atlanta has exercised its delegated power pursuant to the state authorization, and therefore, is entitled to the exemption from the Sherman Act challenge. Town of Hallie v. City of Eau Claire, —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

## V

For the foregoing reasons, we AFFIRM.