*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0132P (6th Cir.)
File Name: 00a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FAIR HOUSING ADVOCATES
ASSOCIATION, INC.,
            *Plaintiff-Appellant,*

            *v.*

CITY OF RICHMOND HEIGHTS,
OHIO,

            *Defendant,*

CITY OF WARRENSVILLE
HEIGHTS, OHIO; CITY OF
FAIRVIEW PARK, OHIO; CITY
OF BEDFORD HEIGHTS, OHIO,
            *Defendants-Appellees.*



No. 98-3523

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-01438—James S. Gwin, District Judge.

Argued: August 3, 1999

Decided and Filed: April 13, 2000

Before: JONES, BATCHELDER, and COLE, Circuit
Judges.

1

———————————

**COUNSEL**

**ARGUED:** Andrew L. Margolius, Cleveland, Ohio, for Appellant. Alan E. Johnson, WARD & ASSOCIATES, Cleveland, Ohio, Charles E. Merchant, CITY OF BEDFORD HEIGHTS DEPARTMENT OF LAW, Bedford Heights, Ohio, for Appellees. **ON BRIEF:** Andrew L. Margolius, Cleveland, Ohio, for Appellant. Alan E. Johnson, Leo R. Ward, WARD & ASSOCIATES, Cleveland, Ohio, Charles E. Merchant, CITY OF BEDFORD HEIGHTS DEPARTMENT OF LAW, Bedford Heights, Ohio, for Appellees. Stephen M. Dane, Michael L. Stokes, COOPER, WALINSKI & CRAMER, Toledo, Ohio, for Amicus Curiae.

   JONES, J., delivered the opinion of the court, in which COLE, J., joined. BATCHELDER, J. (pp. 23-34), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

   NATHANIEL R. JONES, Circuit Judge. Plaintiff-appellant Fair Housing Advocates Association, Inc. ("Housing Advocates") filed a complaint against defendants-appellees[1] the City of Warrensville Heights, Ohio; the City of Fairview Park, Ohio; and the City of Bedford Heights, Ohio (collectively "the Cities") asserting that each city's occupancy ordinance discriminated against certain individuals based on familial status, thereby violating the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* Conversely, the Cities argue that their ordinances are reasonable occupancy

---

[1]Housing Advocates also named the City of Richmond Heights, Ohio as a defendant. However, Housing Advocates thereafter filed a stipulation voluntarily dismissing Richmond Heights.

### III.

In summary, although I concur in the majority's ultimate judgment that the ordinances at issue here were reasonable, I believe that the rationale it uses to reach that result severely undermines the respect we owe to states' and localities' use of their police powers. Requiring cities to prove their neutral, numerically based maximum occupancy restrictions to be reasonable flies in the face of the wealth of precedent according a presumption of reasonableness and constitutional validity to enactments based on these historically non-federal powers.

ordinances, enacted in full compliance with the FHA. The district court, after a bench trial, entered judgment on behalf of the Cities. *See Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights*, 998 F. Supp. 825 (N.D. Ohio 1998). For the reasons that follow, we **AFFIRM** the district court's judgment.

### I.

Housing Advocates is a "non-profit private fair housing corporation whose mission is to eliminate housing discrimination and promote equal opportunities in housing." J.A. at 321. Toward that end, Housing Advocates conducts seminars and workshops for housing providers and the general public, investigates possible FHA violations, and monitors various housing markets to ensure FHA compliance. In 1993, while investigating another fair housing matter, Housing Advocates discovered that each of the Cities' housing codes contained what it considered to be unusually restrictive occupancy standards. Housing Advocates conducted further tests and investigations in each of the Cities, and determined that the occupancy ordinances were unduly restrictive and discriminated against families. Defendants-appellees are suburban cities located in Cuyahoga County, Ohio, adjacent to the City of Cleveland. None of the Cities own, operate or rent any apartments.

On July 3, 1996, Housing Advocates filed a complaint against the Cities asserting that each city enacted an occupancy ordinance which impermissibly discriminates against individuals based on family status in violation of the FHA. On March 16, 1998, the district court conducted a bench trial, during which the parties presented testimony from various expert witnesses. In addition, the parties stipulated that the deposition testimony of several other witnesses could be submitted to the court in lieu of live testimony. The parties also stipulated to the admission of various exhibits.

The specific evidence presented at trial by the Housing Advocates can be summarized as follows:

**Bedford Heights**

Bedford Heights enacted its first occupancy ordinance in February 1989. The 1989 version of the ordinance required a minimum of 300 square feet of habitable floor space[2] for the first occupant and an additional 200 square feet for each additional occupant. Codified Ordinance § 1387.14, the version of the ordinance now being challenged by Housing Advocates was adopted in September 1991. The 1991 occupancy ordinance requires a minimum of 200 square feet of habitable space for the first occupant and 150 additional square feet for each additional occupant. The ordinance further requires a minimum of 650 square feet of habitable space for dwellings having four occupants.

The deposition testimony of John Marrelli, the Bedford Heights Building Commissioner at the time the ordinance was enacted, was presented at trial. Marrelli testified that the ordinance was passed, in part, due to residents' concerns about too many people living in one apartment, unsupervised children, children playing in unsafe environments (*e.g.*, balconies, parking lots, hallways, elevators), noise, and overcrowding. Further, in response to plaintiff's counsel's question of whether "[t]he law was directed towards problems associated with children and problems that other tenants, adult tenants, were experiencing in relation to these

---

[2]Although each city defines habitable floor space slightly differently, the term in general is defined as "the floor area in any room in any multiple dwelling . . . which floor area is required to be contained within such dwelling . . . in order to meet the minimum requirements of this Housing Code." *Fair Hous. Advocates Ass'n*, 998 F.Supp. at 827. Similarly, a "habitable room" is defined as "a room or enclosed floor space used or intended to be used for living, sleeping, or eating purposes." *Id.* Hallways, bathrooms, laundries, pantries and boiler rooms are typically excluded from the definition of a "habitable room." *See id.* at 826-27.

Legislature * * *.' *E.g.*, *Sproles v. Binford*, 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167 (1932).

* * *

Our past cases leave no doubt that appellants [challenging the ordinance] had the burden on 'reasonableness.'

*Goldblatt*, 369 U.S. at 594-95, 596. This is the same test we applied in *Kutrom Corp.* *See* 979 F.2d at 1174 ("The Supreme Court has stated repeatedly that an ordinance or statute directed toward economic or social welfare regulation adopted in exercise of police powers is presumptively valid, and the burden on the issue of reasonableness lies with the party challenging such an enactment"). The Court in *City of Edmonds* suggested that the FHA's reasonableness requirement is no more demanding than this lenient test. *See* 514 U.S. at 734. n. 8 (quoting legislative history suggesting that a reasonable ordinance is one that is applied evenly and does not discriminate on a basis regulated by the FHA); *id.* at 737 ("this contention . . . exaggerates the force of the FHA's antidiscrimination provisions. [W]hen applicable, [they] require only 'reasonable' accommodations").

For these reasons, I read the *City of Edmonds* decision and the FHA's text and legislative history as affirming the propriety of presuming local maximum occupancy restrictions based on police powers to be valid. At the very least, they remove the FHA's anti-discrimination policy considerations from our analysis, in which case the majority's rationale for denying the traditional presumption of validity disappears. Applying this presumption *ipso facto* requires us to place the burden of disproving the ordinances' reasonableness on the challengers, for by definition a presumption is a rule of law creating "an inference in favor of a particular fact" until rebutted. BLACK'S LAW DICTIONARY 822 (Abr. 6th ed. 1991); *see also* Fed. R. Evid. 301.

1176, 1179 (8th Cir. 1992) (same); *Doe v. City of Butler, Penn.*, 892 F.2d 315, 324 n. 5 (3d Cir. 1989) (recognizing distinction by refusing to express opinion on whether HUD regulations are applicable to governmental as opposed to private occupancy limits); *United States v. Tropic Seas, Inc.*, 887 F.Supp. 1347, 1361 (D. Hawai´i 1995) (applying stricter standard to private limits); *United States v. Lepore*, 816 F.Supp. 1011, 1021 (M.D. Penn. 1991) (same). While the majority's assignment of the burden of proof to the party claiming § 3607(b)(1)'s exemption may be appropriate when the restriction is privately initiated, it is inappropriate here.

Section 3607(b)(1)'s proviso limiting its exception to only "reasonable" restrictions is also consistent with a presumption of the ordinances' validity. The presumption in favor of a police power-based ordinance has never been irrebuttable, and its constitutional validity has always hinged on the ordinance's reasonableness:

> The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard of 'reasonableness,' this Court has generally refrained from announcing any specific criteria. The classic statement of the rule in *Lawton v. Steele*, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894), is still valid today:

> > 'To justify the state in * * * interposing its authority in behalf of the public, it must appear--First, that the interests of the public * * * require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.'

> Even this rule is not applied with strict precision, for this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the

children," Marrelli answered, "Yes." J.A. at 126. However, Marrelli also stated that in passing the ordinance, the city "did not look at [the ordinance] as having an impact on any specific group of persons. . . .We weren't trying to define who could live in the suites, but how many." J.A. at 129. He further stated that the ordinance was passed to address "[h]ealth, safety, and sanitation" problems that could result from overcrowding. J.A. at 137. According to Marrelli, the ordinance was enacted as a result of the 1988 amendments to the FHA, and in response to landlords' and tenants' complaints regarding overcrowding. Thus, after the FHA amendments were passed, information regarding these amendments, along with a draft of the proposed ordinance, was submitted to local apartment landlords/owners. Bedford Heights, working with the landlords/owners, developed the square footage requirements included in the final version of the ordinance.

In addition, B. Allen Clutter, Vice-President and General Manager of Owners Management Company, testified at trial.[3] Clutter stated that although using a square footage occupancy standard is not unreasonable, for consistency purposes, Owners Management imposes a two-person-per- bedroom standard. Clutter further admitted that he was aware that Owners Management was in violation of Bedford Heights's occupancy ordinance due to the company's two-person-per-bedroom standard. A letter Clutter wrote to the Mayor of Bedford Heights shortly before enactment of the 1989 occupancy ordinance was also presented at trial. This letter referenced the 1988 FHA Amendments and pointed out that Bedford Heights did not have an occupancy ordinance. Clutter indicated in his letter that he knew "there [would] be a great demand for family housing in this area because of the school system," and thus, he "urge[d] [the Mayor] to consider

---

[3]Owners Management Company is a subsidiary of a company which owns, develops and manages apartment buildings in several states and cities, including Bedford Heights.

proposing such [occupancy] standards so that over crowding does not occur." J.A. at 523.

## Fairview Park

Fairview Park has had an occupancy ordinance in place since 1967, and the challenged version of the ordinance, Codified Ordinance § 1357.03(d), was enacted in November 1989. Fairview Park's occupancy ordinance requires each dwelling to have a minimum of 300 square feet of habitable floor area for the first occupant and an additional 150 square feet of habitable floor area for each additional occupant. Further, a minimum of 750 square feet is required for a dwelling unit with four occupants. Fairview Park's occupancy ordinance also imposes a minimum square footage requirement regarding "habitable bedroom floor area." Pursuant to this provision, each bedroom in a dwelling unit must have a minimum of 80 square feet of habitable floor area for each bedroom[4] for the first occupant and a minimum of 50 square feet for each additional occupant.

The deposition testimonies of David Cook, President of the Fairview Park City Council at the time the occupancy ordinance was passed, and William Minek, City Council member at the time, were also presented at trial. Both Cook and Minek testified that they could not recall specific discussions about the hearings the city held in relation to passing the ordinance, nor could they specifically recall why they voted for the ordinance. However, Cook stated that "[t]here [was] never . . . a discussion of children" at any of the occupancy ordinance meetings, J.A. at 77, and Minek stated that he did not recall whether "overcrowding or children-related issues" were discussed at any of the meetings, J.A. at 89.

---

[4] Fairview Park's ordinance defines a "bedroom" as "a habitable room designed for sleeping purposes, and which has a minimum habitable floor area of 80 square feet." J.A. at 33.

Moreover, at least one case cited by the majority stands merely for the proposition that *ambiguous* terms will be construed according to the statute's remedial purpose and against the party claiming the exemption. *See Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*, 36 F.3d 177, 181, 186 (1st Cir. 1994). *City of Edmond*'s holding that numerical occupancy limits such as those at issue here "plainly and unmistakably" qualify for the exception leaves little ambiguity to construe. Additionally, reliance on cases construing exemptions in federal laws governing private individuals does nothing to address whether the Cities' ordinances retain their presumption of validity—and thus whether the burden remains on the challengers—under the FHA. *See Grancare*, 137 F.3d 372 (NLRA); *Herman v. Palo Group Foster Home*, 183 F.3d 468 (6th Cir. 1999) (Fair Labor Standards Act); *Jones v. FBI*, 41 F.3d 238, 244 (6th Cir. 1994) (Freedom of Information Act).

Most of the cases cited by the majority which place the burden on parties claiming an exemption involve private parties and not localities. By its own terms, however, § 3607(b)(1) applies only to "local, State, or Federal restrictions." This is consistent with the accordance of a presumption of validity to police power-based ordinances. A number of courts, as well as HUD, have taken note of this distinction, and applied a much higher scrutiny to occupancy limits based on private rules rather than local ordinances. *See, e.g.*, *Pfaff v. United States Dept. of Housing and Urban Development*, 88 F.3d 739, 746 (9th Cir. 1996) ("this provision [lessens] the burden of the fair housing laws on government entities as compared to private landlords") (citing H.R. Rep. No. 711, 100th Cong., 2d Sess., at 31 (1988), reprinted in 1988 U.S.S.C.A.N. 2173, 2192); *id.* at 748 ("the Department will carefully examine any such nongovernmental restriction" (quoting HUD's original interpretation of the 1988 Amendments in *Implementation of the Fair Housing Amendments Act of 1988*, 54 Fed. Reg. 3232, 3237 (Jan. 23, 1989))); *Brandt v. Village of Chebanse, Ill.*, 82 F.3d 172, 174 (7th Cir. 1996) (same); *United States v. Badgett*, 976 F.2d

§ 3607(b)(1)'s breadth, and it is undisputed that the ordinances here fall within it. *City of Edmonds* therefore also commands that the FHA, exemption or not, is no longer relevant to the inquiry. To the extent that the authorities cited by the majority suggest otherwise, they are, in my opinion, mistaken. For the same reason, the majority's emphasis on the fact that the FHA is a remedial statute is also irrelevant once we decide that the exemption applies.

I also find the majority's reasoning undermined by its omission of several critical elements in the cases it cites for this proposition. Most glaringly, the majority blatantly misrepresents our holding in *Grancare, Inc. v. National Labor Relations Board*, 137 F.3d 372, 378 (6th Cir. 1998). There, a nursing care facility asserted an exemption to the National Labor Relations Act that excluded "supervisors" from joining collective bargaining units with other employees. Consistent with our precedent, *see NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076, 1080 (6th Cir. 1987), we held through Judge Surheinrich that the NLRB bore the burden of proving that the employees were not supervisors, and that it had impermissibly shifted that burden to the employer. *See Grancare*, 137 F.3d at 375. Judge Moore filed an opinion concurring in the result but disagreeing with the placement of the burden on the Board, and it is a passage from that opinion—which is contrary to that case's actual holding—that the majority now cites as the proposition *Grancare* stands for. *See id.* at 378. The majority's citation to Judge Moore's concurrence is made even more troubling by the fact that Judge Jones, the author of today's majority opinion, solidified *Grancare*'s actual holding in a separate opinion "concur[ring] in [Judge Surheinrich]'s well-reasoned opinion." *Id.* at 376. Judge Jones's *Grancare* concurrence sympathized with Judge Moore's concerns, but agreed that "we are clearly bound by Sixth Circuit precedent which places the burden on the Board to prove that employees are not supervisors." *Id.* at 377.

In addition, the deposition testimony of James Thompson, Fairview Park's Assistant Building Commissioner, was also presented at trial. Thompson stated that his office receives only a few complaints each year from city residents alleging that certain dwellings are in violation of the ordinance, *i.e.*, overcrowded. According to Thompson, upon investigating these complaints, he found that there were no violations and that there were never more occupants of a dwelling than were allowed by the ordinance.

**Warrensville Heights**

Warrensville Heights adopted its current occupancy ordinance, Codified Ordinance § 1377.03(d), in March 1989. This ordinance requires 350 square feet of habitable floor area for the first occupant and an additional 100 square feet for each additional occupant. Further, the occupancy ordinance requires a minimum of 650 square feet of habitable space for dwellings with four occupants.

Williams Pegues, President of the Warrensville Heights City Council at the time the ordinance was passed, testified in his deposition that he did not recall specific discussions about the ordinance. He did, however, recall that residents had expressed some concerns to him regarding problems with overcrowding, and indicated that they had moved to Warrensville Heights in order to have more space. However, according to Pegues, none of the residents expressed any concern about children. Pegues also stated that it was unlikely that landlords provided any input into the city's decision to enact the ordinance. The deposition testimony of Nathaniel Harris, Warrensville Heights's Chief Housing Inspector at the time, was also presented at trial. Harris provided general information regarding the enforcement of the city's occupancy ordinance. Further, the deposition testimonies of three Warrensville Heights landlords were also presented at trial. Two of the landlords testified that their apartment management companies imposed two-person-per-bedroom restrictions, but were unaware of whether their

standards violated the more specific square footage requirements set forth in Warrensville Heights's occupancy ordinance. The third landlord stated that his apartment complex followed the occupancy ordinance, and due to the ordinance, the complex allowed a maximum of three occupants for two bedroom dwellings. None of the landlords recalled being approached by any Warrensville Heights official regarding possible violations of the occupancy ordinance.

**Housing Advocates**

Housing Advocates submitted evidence regarding model occupancy standards established by the Building Officials and Code Administrators ("BOCA"). All three Cities were members of BOCA at the time they enacted their respective occupancy ordinances. The BOCA model code, which was formulated by housing experts from around the country, set forth the following minimum occupancy standards: a minimum 70 square feet of habitable space per person in a bedroom for the first occupant and 50 square feet of habitable space in a bedroom for two or more occupants. For dwellings with three to five occupants, BOCA requires a minimum of 120 square feet in a living room, 80 square feet in a dining room, and 50 square feet in a kitchen. Housing Advocates presented evidence that two other groups, the Ohio Apartment Association and the Northeast Ohio Apartment Association, had not adopted square footage requirements, but merely determined that a two-person per-bedroom occupancy standard is appropriate. Housing Advocates further established that the Cities did not conduct any formal studies before enacting their respective ordinances.

Housing Advocates consulted several land planners and housing experts, each of whom testified at trial that the Cities' occupancy ordinances are unreasonable. *See Fair Hous. Advocates Ass'n*, 998 F. Supp. at 829. For example, Martin Jarret, a land planner and city planning consultant, stated that the restrictions included in each city's ordinance were more

its holding was a narrow one limited to this question only. *See id*. at 728, 731, 738. *City of Edmonds* decided that § 3607(b)(1) exempted only "numerical ceilings that serve to prevent overcrowding in living quarters," and not the type of ordinance at issue there, which defined what composed a family unit and applied different occupancy rules on that basis. *Id*. at 731. The Court differentiated land-use restrictions that are necessarily based on value judgments from numerical occupancy limits that are neutral and evenly applied. *See id*. at 732-34. These latter ordinances "*plainly and unmistakably* fall within § 3607(b)(1)'s *absolute exemption* from the FHA's governance." *Id.* at 735 (internal quotations omitted, emphasis added). The section "*entirely exempts* [such ordinances] from the FHA's compass." *Id.* at 728 (emphasis added).

The majority purports to follow *City of Edmonds*'s lead in construing the exemption narrowly to promote the FHA's broader policy. In actuality, by narrowly construing both the breadth and effect of the exemption, the majority ignores both the legislative intent of § 3607(b)(1) to protect numerical occupancy limits and the Court's express admonition that once an ordinance is determined to be such a neutral, numerical law—a fact the majority freely concedes here—it is no longer subject to the FHA's anti-discrimination regime.

The majority also cites general principles of statutory construction and a string of cases for the generic proposition that a party claiming an exemption from a statute has the burden of proving its applicability. This is not an objectionable concept in the abstract. The Supreme Court itself said as much in *City of Edmonds* in a preface to its discussion of the family-defining ordinance at issue there. *See* 514 U.S. at 731-32. But that decision and each case cited by the majority were concerned with the types of restrictions that would qualify for the exemption, not the scrutiny to be given after deciding that the exemption in fact applies. The breadth of the exemption and its effect are wholly separate questions. *City of Edmonds* settled the question of

significance in a case involving a historic police power, we nonetheless presume that exercise of power to be constitutionally valid. The idea that we should give that degree of deference to police power ordinances in constitutional arenas but not in the context of statutory regimes such as the FHA is entirely unsupported by the majority's bare observation that this is an FHA case and *Kutrom Corp.* involved the Due Process Clause. Indeed, the idea is simply unsupportable.

## II.

Beginning from these precedents, it seems plain to me that neither the FHA's text, its legislative history, the Supreme Court's *City of Edmonds* decision, nor any "general principles of statutory construction" mandate a departure from our standard practice of according police power ordinances a presumption of validity and placing the burden on the challenger to prove otherwise. The pertinent sentence of 42 U.S.C. § 3607(b)(1) reads: "Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." As the majority has noted, the Court in *City of Edmonds* found it "[t]elling" that this provision was added simultaneously with the 1988 Amendments broadening the FHA's scope to prohibit discrimination based on family status. "Section 3607(b)(1) makes it plain that, pursuant to local prescriptions on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters." *City of Edmonds*, 514 U.S. at 735 n. 9. Clearly this section was intended to prevent overzealous judicial application of the FHA's broad, anti-discrimination policy from having the unintended consequence of invalidating legitimate anti-overcrowding ordinances. The Court did continue to read § 3607(b)(1)'s exemption narrowly in order to preserve the primary operation of the FHA's policy, *see id.* at 731-32, but it did this only in measuring the breadth of the exception, not its effect on laws falling within it. The Court repeatedly stressed that

restrictive than BOCA standards. Jarret believed that the Cities' restrictions were not reasonable due to the Cities' deviation from the BOCA standards, and the Cities' failure to specifically analyze an appropriate square footage requirement. On cross-examination, however, Jarret admitted that the issue of reasonableness was debatable.

Following the bench trial, the district court filed its findings of fact and conclusions of law. The district court concluded that Housing Advocates had the burden of proving that the Cities' occupancy ordinances were unreasonable, and that Housing Advocates failed to meet its burden. *See Fair Hous. Advocates Ass'n*, 998 F. Supp. at 830-31. The district court also concluded that the ordinances were health, safety and welfare measures, and were thus entitled to a presumption of validity. *See id.* at 830. As a result of these conclusions, the district court granted judgment for the Cities on each of Housing Advocates' claims. *See id.* at 831. Housing Advocates thereafter filed this timely appeal.

## II.

The FHA was originally enacted in 1968 and prohibited discrimination based on race, color, religion and national origin. Congress thereafter amended the FHA to prohibit housing discrimination based on gender. In 1988, Congress passed the Fair Housing Amendments Act ("FHAA"), thereby extending the FHA's protections, and prohibiting discrimination based on disability and familial status. Specifically, the FHAA makes it unlawful to refuse to sell or rent or to "make unavailable or deny, a dwelling to any person because of . . . familial status[.]" 42 U.S.C. § 3604(a). The FHAA defines "familial status" as:

> [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with–
> (1)  a parent or other person having legal custody of such individual or individuals;  or

(2)  the designee of such parent or other person having such custody, with the written permission of such parent or other person.

42 U.S.C. § 3602(k).  In addition, the FHA also includes several exemptions; the one at issue in the case *sub judice* provides that "[n]othing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."  42 U.S.C. § 3607(b)(1). Although we have not previously interpreted this occupancy exemption, we are substantially aided in our resolution of this issue by  legislative history, applicable administrative regulations, and the Supreme Court's decision in *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995).

## A.  Legislative History

A review of the relevant legislative history regarding the FHA indicates that Congress  was concerned that "families with children, like the other classes protected by title VIII, have been the victims of unfair and discriminatory housing practices." H.R. Rep. No. 100-711, at 13 (1988). Despite its broad goal of eradicating discrimination in housing based on familial status, however, Congress also recognized the legitimate interests local and state governments have in enacting  non-discriminatory  occupancy  restrictions. Accordingly, Congress made clear that:

These  provisions  are  not  intended  to  limit  the applicability of any reasonable local, State, or Federal restrictions  on  the  maximum  number  of  occupants permitted to occupy a dwelling unit.  A number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit.  Reasonable limitations by governments would be allowed to continue, as long as they were applied to all occupants, and did not operate to

*Inc.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999) (following *Rice*'s presumption against preemption).  The presumptive validity of historic police powers, then, is not a peculiarity of due process case law, but a crucial doctrine underlying our entire federalist system of governance.  *Cf. Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941) ("Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies.  [It is wise for federal courts to] restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working  of  the  federal  judiciary"  (internal  quotations omitted)); *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (same).

Second, the majority's statement is premised upon the assumption—an unfathomable one, in my view—that federal courts  should  somehow  be  less  concerned  with  potential constitutional deficiencies in local ordinances than possible violations of the Fair Housing Act.  It is elementary to our judicial system that constitutional law is "the law of the land," and that no legislation—federal, state, or local—will stand if it contradicts constitutional provisions.  A corollary to this principle is that we should be hesitant to accord constitutional significance to our pronouncements, choosing instead to base our holdings on less significant statutory or even procedural grounds whenever plausible.  Thus, we will presumptively interpret statutes in such a way as to avoid constitutional defects, *see*, *e.g.*, *Pak v. Reno*, 196 F.3d 666, 673 (6th Cir. 1999) (majority opinion by Cole, J., and joined by Jones, J.); *Callier v. Gray*, 167 F.2d 987, 992 (6th Cir. 1999), and not reach the constitutional issues raised in a case unless they are necessary to the case's proper resolution.  *See Spector Motor Co. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality [...] unless such adjudication is unavoidable").  And yet, as I discussed above, whenever we do choose to reach the questions of law with constitutional

of proof on reasonableness to the challengers. Once invoked, "the force of the presumption of validity [rendered any further] justification for [the] regulatory ordinance unnecessary." *Id.* at 1175.

In light of the degree to which the presumptive validity of police power ordinances is ingrained in our jurisprudence, the majority's offhand distinction of these cases on the basis that they were decided in the context of constitutional due process challenges instead of the FHA is astounding. First, contrary to the majority's assertion, Fourteenth Amendment Due Process law is not the only context in which this respect for historic police powers has been accorded. As we pointed out in *Kutrom Corp.*, the Supreme Court, in upholding a Sunday closing law in the face of an Equal Protection Clause challenge, commented that "a statutory discrimination will not be set aside if any set of facts reasonably may be conceived to justify it." *Id.* at 1174-75 (quoting *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)). Indeed, the Court has made it quite clear that only classifications based on a few suspect or quasi-suspect groups will get any higher level of Equal Protection scrutiny. The Court has also stated plainly that, notwithstanding an apparent conflict, it will presume that federal laws do not preempt exercises of traditional state and local police powers under the Constitution's Supremacy Clause "unless that was the clear and manifest purpose of Congress." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Hill v. State of Florida ex. rel. Watson*, 325 U.S. 538, 552 (Frankfurter, J., dissenting) ("The principle is thoroughly established that the exercise by the state of its police power, which would be valid, if not superseded by federal action, is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together . . . . Deviations from this policy . . . have been so rare all these decades, despite the changes in the Court, because of fidelity to the purposes of this vital aspect of our federalism" (internal quotations omitted)); *Geier v. American Honda Motor Co.*,

discriminate on the basis of race, color, religion, sex, national origin, handicap or familial status.

*Id.* at 31; *see also Edmonds*, 514 U.S. at 735 n.8 (quoting legislative history).

## B.  Administrative Regulations

Pursuant to the 1988 amendments, HUD was authorized to issue regulations implementing the FHA. Accordingly, HUD issued the Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232 (1989), which includes the following discussion:

While the statutory provision providing exemptions to the [FHA] states that nothing in the law limits the applicability of any reasonable Federal restrictions regarding the maximum number of occupants, there is no support in the statute or its legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code. This interpretation is consistent with Congressional reliance on and encouragement for States and localities to become active participants in the effort to promote achievement of the goal of Fair Housing.

*Id.* at 3237. The HUD regulations further provide that:

Many jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit; HUD also issues occupancy guidelines in its assisted housing programs. Reasonable limitations do not violate the Fair Housing Act as long as they apply equally to all occupants. A substantial number of comments were received asking that the Department adopt occupancy restrictions that housing providers can apply in jurisdictions that do not have governmentally-adopted occupancy restrictions, and in jurisdictions where the governmentally-adopted restrictions are tantamount to no restrictions.

*Id.* at 3253; *see also* 24 C.F.R. § 115.202(c)(1999)("The requirement that the state or local law prohibit discrimination on the basis of familial status does not require that the state or local law limit the applicability of any reasonable local, state or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.").

### C. *City of Edmonds* Decision

In addition to the foregoing legislative history and administrative materials, the Supreme Court also has addressed the issue. In *Edmonds*, the Supreme Court considered whether the City of Edmonds's residential zoning provision limiting the maximum number of unrelated occupants allowed in a single-family dwelling violated the FHA's provision prohibiting discrimination against disabled individuals. 514 U.S. at 728. The City of Edmonds's zoning code provided that occupants of single-family dwellings must compose a "family." The code defined "family" as an unlimited number of related persons or a group of five or fewer unrelated persons. *Id.*

In reviewing the zoning provision, the Court noted that "rules that cap the total number of occupants in order to prevent overcrowding of a dwelling plainly and unmistakably fall within § 3607(b)(1)'s absolute exemption from the FHA's governance." *Id.* at 735 (internal citation and quotations omitted). The Court further noted the following:

> Tellingly, Congress added the § 3607(b)(1) exemption for maximum occupancy restrictions at the same time it enlarged the FHA to include a ban on discrimination based on "familial status." The provision making it illegal to discriminate in housing against families with children under the age of 18 prompted fears that landlords would be forced to allow large families to crowd into small housing units . . . (remarks of Rep. Edwards) (questioning whether a landlord must allow a family with 10 children to live in a two-bedroom

(1977) (upholding denial of building permit for multi-family, low income housing as part of rational zoning plan); *Memphis v. Green*, 451 U.S. 100 (1981) (upholding against a racial discrimination claim an ordinance diverting traffic from residential neighborhood); *Tower Realty*, 196 F.2d at 724 ("Every reasonable presumption or intendment must be indulged in favor of the validity of the ordinance; and, in case of doubt, every presumption not clearly inconsistent with the language and subject matter is to be made in favor of its constitutionality"); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303, 308 (6th Cir. 1983) (upholding denial to build church in areas zoned as exclusively residential); *Curto v. City of Harper Woods*, 954 F.2d 1237, 1242 (6th Cir. 1992) (per curiam) (holding that ordinances, whether zoning or regulatory, "which represent[] an exercise of the municipality's police powers [are] presumed to be constitutionally valid, with the burden of showing unreasonableness being cast upon those who challenge the ordinance . . . . [S]uch presumptions are entitled to as much force and effect under summary judgment procedure as elsewhere" (internal quotations omitted)). All exercises of police powers are entitled to an equal level of respect. *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959).

Few of our cases articulate this basic doctrine more clearly than *Kutrom Corp. v. City of Center Line*, 979 F.2d 1171 (6th Cir. 1992), to which the majority gives only passing obeisance. The question presented in that case was whether summary judgment was properly granted on the basis of the ordinance's presumptive validity without requiring the city, as the moving party, to provide any affirmative evidence of the law's reasonableness. *See id.* at 1171-72. Holding that mere reliance on the presumption of validity was proper, we noted that the "lenient 'rational basis' test finds its least stringent application in cases involving a governmental unit's exercise of its police powers." *Id.* at 1174. We required the city merely to invoke the presumption and identify a possible, legitimate basis for the ordinance in order to shift the burden

majority does not disturb the district court's finding that the maximum occupancy ordinances at issue are in fact exercises of police powers intended to prevent overcrowding in apartment buildings, and the Supreme Court has confirmed that such laws are enacted to protect the health and safety of citizens. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 733-34 (1995). Health and safety concerns are at the very heart of local police powers, and our respect for ordinances controlling uses of land for these reasons extends far back into our jurisprudence. *See, e.g., Tower Realty v. City of Detroit*, 196 F.2d 710, 722 (6th Cir. 1952) (quoting *Fischer v. City of St. Louis*, 194 U.S. 361, 370 (1904)) ("The power of the legislature to authorize its municipalities to regulate and suppress all such places . . . as, in its judgment, are likely to be injurious to the health of its inhabitants, or to disturb people living in the immediate neighborhood . . . , is so clearly within the police power as to be no longer open to question"). Such enactments have long been accorded a presumption of validity. *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926) (requiring zoning laws to be upheld as valid exercises of police power unless "clearly arbitrary or unreasonable, having no substantial relation to the public health, safety, morals or general welfare"); *Goldblatt v. Town of Hempstead, New York*, 369 U.S. 590, 593 (1962) ("If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional . . . . The power which the states have of prohibiting such use . . . as will be prejudicial to the health, the morals, or the safety of the public, is not, and consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may suffer" (internal quotations omitted)); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974) (acknowledging a village's police power as "ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people"); *Village of Arlington Hts. v. Metropolitan Housing Development Corp.*, 429 U.S. 252

apartment). Section 3607(b)(1) makes it plain that, pursuant to local prescriptions on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters.

*Id.* at 735 n.9 (internal citations omitted). After reviewing the legislative history and applicable regulations, however, the Supreme Court concluded that the city's zoning provision did not fall within the occupancy exemption set forth in § 3607(b)(1) because the provision did not limit the number of occupants that were allowed to occupy a dwelling, but rather "describe[d] who may compose a family unit." *Id.* at 728. The Court held that § 3607(b)(1) "removes from the FHA's scope only total occupancy limits, *i.e.*, numerical ceilings that serve to prevent overcrowding in living quarters," not "provisions designed to foster the family character of a neighborhood." *Id.*

Despite the obvious deference afforded to maximum occupancy restrictions, however, the Court made clear that such restrictions are not simply "rubber stamped" by the courts, but instead, require some level of scrutiny. The Supreme Court noted that courts must remain "'mindful of the Act's stated policy to provide, within constitutional limitations, for fair housing throughout the United States.'" *Edmonds*, 514 U.S. at 731 (quoting § 3601). Further, the Court noted that exceptions to the FHA's "general statement of policy" must be "read narrowly in order to preserve the primary operation of the policy." *Id.* at 731-32 (internal quotations and alteration omitted). With this clear guidance in mind, we consider whether the Cities' occupancy ordinances qualify for the § 3607(b)(1) exemption.

### III.

Based on the plain language of § 3607(b)(1), and the standards articulated in the legislative history, the administrative regulations and *Edmonds*, we find that in order to qualify for a §3607(b)(1) exemption, each city's ordinance

must be a (1) reasonable; (2) "local, State, or Federal restrictio[n];" (3) regarding "the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). The occupancy ordinances at issue here clearly meet prongs two and three because they are ordinances enacted by municipalities that set restrictions on the number of occupants permitted to occupy an apartment. Thus, we must determine whether these occupancy ordinances are "reasonable," and whether Housing Advocates or the Cities bear the burden of proving that these ordinances are reasonable. Housing Advocates contends that because the Cities are attempting to invoke an exemption to the FHA, the Cities bear the burden of proving that their ordinances fall within this exemption, and must therefore establish that their ordinances are reasonable. Conversely, the Cities respond that the ordinances are valid, non-discriminatory efforts to limit occupancy, and therefore, Housing Advocates must prove that the ordinances are unreasonable.

### A. Allocation of Burdens of Proof

The district court concluded that "Plaintiff has the burden to show that the ordinance[s] [are] unreasonable." *Fair Hous. Advocates Ass'n*, 998 F. Supp. at 830 (citing *Kutrom Corp. v. City of Center Line*, 979 F.2d 1171, 1174 (6th Cir. 1992)). Housing Advocates contends that it is well-settled that the party seeking an exemption to the FHA bears the burden of proving that it is entitled to the exemption, and thus, the district court erroneously placed the burden on Housing Advocates. We agree with Housing Advocates, and find that the district court improperly allocated the burden of proof.

Federal courts have repeatedly concluded that the party claiming the exemption "carries the burden of proving its eligibility for the exemption," and that "[e]xemptions from the [FHA] are to be construed narrowly, in recognition of the important goal of preventing housing discrimination." *Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d

_____

### CONCURRENCE
_____

ALICE M. BATCHELDER, Circuit Judge, concurring in judgment. I agree with the majority that the maximum occupancy regulations at issue here are valid exercises of the Cities' police powers that withstand the scrutiny of the Fair Housing Act, but I cannot concur in its reasoning. In my opinion, the majority gives far too little respect to the traditional police powers of states and localities. Requiring the Cities to prove their ordinances reasonable not only turns the traditional notion of federalism on its head, but contradicts the basic assumption of our legal system that plaintiffs in civil litigation bear the burden of making out each element of their claims. I do not read anything in the Fair Housing Act as requiring this result. I therefore respectfully object to the majority's characterization of the controlling law in Part III of its opinion.

#### I.

The majority relies heavily on "general principles of statutory construction" for its conclusion that the Cities should have to prove that their ordinances are "reasonable," because that term is found in an "exemption" to the FHA. It also dismisses in a single paragraph the concept that ordinances enacted pursuant to historic, local police powers are entitled to a presumption of validity in federal courts with the observation that this idea emanates from cases involving constitutional due process challenges, not potential FHA violations. In my view, this is exactly the wrong approach.

Instead, we should begin by recognizing the traditional deference given to exercises of a locality's police power. This presumption of validity stems from a recognition that federal courts should be wary to tread on the spheres of authority that were never given up by state and local governments. The

### V.

Based on the foregoing, we **AFFIRM** the district court's grant of judgment for the defendants, although we reject its allocation of the burden of proof and presumption of validity. Because the record in this case is thorough, and provides sufficient evidence from which we conclude that the Cities satisfied their burden of proving that their respective occupancy ordinances were "reasonable" as required to invoke the § 3607(b)(1) exemption, we find a remand unnecessary.

1472, 1475 (11th Cir. 1993), *cert. denied* 513 U.S. 808 (1994); *see also Hogar Agua y Vida en el Desierto v. Suarez-Medina*, 36 F.3d 177, 182 (1st Cir. 1994)("exemptions from the requirements of a *remedial statute*–like the FHA–are to be construed narrowly to limit exemption eligibility")(citing *Massaro*)(discussing "single-family house" exemption to FHA); *United States v. City of Hayward*, 36 F.3d 832, 837 (9th Cir. 1994)(same); *Rogers v. Windmill Pointe Village Club Ass'n, Inc.*, 967 F.2d 525, 527 (11th Cir. 1992)("Under general principles of statutory construction, one who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception.")(alterations, citations and internal quotations omitted); *United States v. Columbus Country Club*, 915 F.2d 877, 882 (3rd Cir. 1990)(noting that the defendant bears the burden of proving that it fits within the FHA's "religious organization" exemption, § 3607(a)).

We further conclude that placing the burden on the defendants in this case comports with our caselaw discussing exemptions from other statutes, and holding that the party seeking to invoke the exemption bears the burden of proving that it is entitled to that exemption. For example, in *Grancare, Inc. v. NLRB*, 137 F.3d 372 (6th Cir. 1998) we concluded that:

> [R]eviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach . . . In an effort to effectuate Congress's purpose that the exclusion of supervisors from the Act's protections be a limited one, the Board places the burden of proving supervisory status upon those invoking the exemption. In contrast, placing the burden of proof on the Board presumes that all employees simply asserted by employers to be supervisors are exempt from the Act's coverage until proven otherwise.

*Id.* at 378 (internal quotations and citations omitted); *see also Herman v. Palo Group Foster Home*, __ F.3d __, No. 97-2102, 1999 WL 498932, at *2 (6th Cir. 1999)(holding that Fair Labor Standards Act exemptions are to be narrowly construed and employer claiming exemption has burden of proving that exemption applies); *Jones v. FBI*, 41 F.3d 238, 244 (6th Cir. 1994)(exemptions under Freedom of Information Act are to be narrowly construed and "burden is on the defendant agency to demonstrate, not the requester to disprove, that the materials sought may be withheld due to an exemption")(internal quotations and citations omitted).

Based on the foregoing caselaw, we find that the district court erred in concluding that Housing Advocates was required to establish that the ordinances were unreasonable, as opposed to requiring the Cities to establish that the ordinances were reasonable.

### B. Presumption of Validity

Citing *Kutrom*, the district court also concluded that the Cities' occupancy ordinances are "an exercise of the local government's police power on social legislation enacted to protect the public health, safety and welfare and, [are] therefore, entitled to a presumption of validity." *Fair Hous. Advocates Ass'n*, 998 F. Supp. at 830 (citing *Kutrom*, 979 F.2d at 1174). Housing Advocates also challenges the district court's conclusion in this regard, arguing that FHA exemptions are to be read narrowly, and thus, the district court erred in finding that the occupancy ordinances were presumptively valid. Housing Advocates' position on this point is also well-taken. We find the district court's reliance on *Kutrom* to be misplaced, for the Cities are not entitled to the presumption of validity where they attempt to invoke an exemption under the FHA.

In *Kutrom*, the plaintiff challenged an ordinance regulating massage parlors in the city, claiming that the ordinance violated the due process clauses of the Fifth and Fourteenth

1990 WL 97490, at *4 (6th Cir. July 13, 1990)(same). However, we conclude that based on the evidence presented, Housing Advocates has failed to satisfy either of these tests, and the district court thus properly denied Housing Advocates' claim on this ground.[7].

In support of its discrimination argument, Housing Advocates notes that the population was decreasing in each city; the ordinances were passed shortly after enactment of the FHA amendments extending protections to families; the ordinances were more restrictive than BOCA's standards; and the ordinances would prohibit many families from finding housing. We find this evidence insufficient to establish that the Cities' intended to discriminate against families. The ordinances are facially neutral and apply equally to families and unrelated individuals who occupy dwellings in the respective Cities. Further, Housing Advocates conceded in the parties' joint stipulations that "[n]one of the square footage restrictions in the occupancy ordinances of the defendant municipalities facially discriminate on a familial basis." *Fair Hous. Advocates Ass'n*, 998 F. Supp. at 826. Housing Advocates has also failed to establish that the occupancy ordinances had a discriminatory effect on families as required by the discriminatory impact analysis. Further, as the Cities point out, families of four, as opposed to families of three, are not protected classes.

---

[7] We note that Housing Advocates's argument is strongest against Bedford Heights's ordinance, because there was evidence in the record that, to some extent, the issue of children was discussed in conjunction with that city's decision to enact the ordinance. This may suggest that Bedford Heights's decision was not completely motivated by issues of overcrowding. Despite this evidence against Bedford Heights, we find that Housing Advocates has not established discriminatory intent or impact with regard to that city.

restricting the number of unrelated individuals who may occupy a single family residence are reasonably related to these legitimate goals. *The City does not need to assert a specific reason for choosing eight as the cut-off point, rather than ten or twelve. Every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.*

*Id.* at 252 (emphasis added)(internal quotations and citations omitted). The rationale of *Oxford House* applies with equal force here. The "exercise of discretion" as to whether to require a minimum of 650 square feet for an apartment of four people, as opposed to a minimum of 500 square feet or 800 square feet, is a legislative, not a judicial function.[6]

### IV.

Finally, Housing Advocates contends that the Cities' occupancy ordinances were invalid because they (1) were enacted to discriminate against families of four; and (2) had a discriminatory impact on families of four. We have applied the discriminatory treatment and impact analyses to FHA claims. *See Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986); *Blaz v. Barberton Garden Apt.*, No. 91-3896, 1992 WL 180180, at *3 (6th Cir. July 29, 1992)("[A] violation of the [FHA] can be established by a showing of discriminatory intent or discriminatory effect.")(citing *Arthur*); *Troy v. Suburban Management Corp.*, No. 89-1282,

---

[6]Housing Advocates also contends that the ordinances were unreasonable because the population in each city declined over a 20-year period. However, as the Cities point out, the fact that the population of each city has declined over the past twenty years is not dispositive. As the Supreme Court noted in *Edmonds*, the purpose of many occupancy restrictions is to "protect health and safety by preventing *dwelling* overcrowding." *Edmonds*, 514 U.S. at 733 (emphasis added). Thus, the purpose of the ordinance does not have to be to prevent overcrowding of a particular apartment complex, an area of the city, or the entire city, but simply to prevent overcrowding of each dwelling.

Amendments. The city enacted the ordinance in order to limit the hours during which massage parlors could be open, to regulate the attire of each masseuse, and to eliminate prostitution that was allegedly occurring in such parlors. *See* 979 F.2d at 1172. We held that such an ordinance was a valid health, safety and welfare measure, and was therefore presumptively valid. The presumption of validity standard we applied in *Kutrom* was based on the "rational basis" test utilized in addressing constitutional challenges to "economic or social welfare regulation adopted in exercise of police powers." *Id.* at 1174; *see also Goldblatt v. Town of Hempstead*, 369 U.S. 590, 595-96 (1962); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959)("The various exercises by the States of their police power . . . are entitled to the same presumption of validity *when challenged under the Due Process Clause of the Fourteenth Amendment*.")(emphasis added). By contrast, the Cities in this case are attempting to invoke an exemption under the FHA, and thus *Kutrom* is inapposite. Accordingly, the district court's reliance on *Kutrom*, and its conclusion that the Cities' occupancy ordinances are presumptively valid, was erroneous.

### C. Reasonableness Inquiry

As set forth above, the Cities bear the burden of proving that the ordinances are reasonable. However, at trial, the district court placed that burden on Housing Advocates. Due to the district court's incorrect allocation of the burden, Housing Advocates urges us to conclude that the ordinances violate the FHA, or, in the alternative, to remand and order the district court to review the matter using the correct allocation of the burden of proof. Despite the district court's improper allocation of the burden of proving reasonableness, we find that based on the ample evidence presented in the record, the Cities have presented evidence sufficient to establish that their ordinances fall within the exemption set

forth in § 3607(b)(1), thereby rendering a remand unnecessary.[5]

As an initial point, we reject the Cities' assertion that because *Edmonds* held that "rules that cap the total number of occupants in order to prevent overcrowding of a dwelling plainly and unmistakably fall within § 3607(b)(1)'s absolute exemption from the FHA's governance," *Edmonds*, 514 U.S. at 735 (citation omitted), we need not undertake any further analysis as to the reasonableness of their occupancy ordinances. A review of the plain language of § 3607 (b)(1) illuminates the fallacy of the Cities' argument on this point. The exemption specifically requires that the ordinances be "reasonable," and in interpreting that exemption, we must give effect to this requirement. Thus, despite the Cities' suggestion to the contrary, the mere fact that the ordinances are municipal occupancy ordinances does not remove them from the reasonableness requirement set forth in the § 3607(b)(1) exemption. Further, the Supreme Court in *Edmonds* did not suggest such a result. Indeed, in *Edmonds*, the Court reiterated that the FHA, and the policies reflected therein, are to be construed broadly, while exemptions to the FHA must be "narrowly" and "sensibly read . . . to preserve the primary operation of the [policy]." *Edmonds*, 514 U.S. at 732. Thus, in order to establish that the ordinances were valid measures entitled to the § 3607(b)(1) exemption, the Cities were required to establish that the ordinances were "reasonable."

We find that the following evidence indicates that the Cities satisfied that burden. First, the Cities' occupancy ordinances "apply uniformly to *all* residents of *all* dwelling units." *Edmonds*, 514 U.S. at 733. Second, the Cities have presented convincing evidence that the ordinances were enacted "to protect health and safety by preventing dwelling overcrowding," not to impermissibly limit the family composition of dwellings. *Id.* Third, Jarret and other Housing Advocates' experts testified that there were several *options* for determining maximum occupancy requirements–a minimum square feet per-person standard; a minimum number of square feet per-bedroom-per-person standard; and a two-person-per-bedroom standard. The Cities were surely permitted to choose which of these standards was the most appropriate for that particular city, particularly in light of the fact that Congress made clear that there is no national occupancy standard. Housing Advocates suggests that *only* the two-person-per-bedroom standard or a different minimum square foot per-person standard would be appropriate. However, the fact that the Cities used a square footage calculation, as opposed to a total number per apartment calculation, does not make the ordinances unreasonable. Similarly, the fact that the ordinances differed from the standards in the BOCA model code and the standards suggested by the apartment associations does not make the ordinances unreasonable. Finally, the Eighth Circuit considered the issue of whether the City of St. Louis violated the FHA by enforcing the city's zoning code to limit the number of residents in group homes to eight individuals, and concluded that the code did not violate the FHA. *See Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996). The Eighth Circuit concluded that the rule was rational and noted that:

> Cities have a legitimate interest in decreasing congestion, traffic, and noise in residential areas, and ordinances

---

[5] We reiterate that even if this matter were remanded to require the district court to determine whether the Cities are able to prove that they are entitled to the § 3607(b)(1) exemption, on any resulting appeal, we would review the district court's determination *de novo*. *See Kildea v. Electro-Wire Prods., Inc.*, 144 F.3d 400, 404 (6th Cir. 1998)(noting that although we review the district court's findings of fact for clear error, we review legal conclusions and mixed questions of law *de novo*); *Razavi v. C.I.R.*, 74 F.3d 125, 127 (6th Cir. 1996)(same). Thus, we would "draw our own inferences and legal conclusions from the record." *Smith v. Wal-Mart Stores*, 167 F.3d 286, 289 (6th Cir. 1999). Moreover, on appeal, we may affirm a district court's judgment for an alternate reason. *See Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir.1985) (per curiam).